Will Falk (Utah Bar No. 16678)
*[Will Comply with L.R. 1a 11-2 within 14 days]*
2980 Russet Sky Trail
Castle Rock, Colorado 80108
Telephone: (319) 830-6086
Email: falkwilt@gmail.com

Terry J. Lodge (Ohio Bar No, 29271)
*[Will Comply with L.R. 1a 11-2 within 14 days]*
316 N. Michigan St., Suite 520
Toledo, OH 43604-5427
Telephone: (419) 205-7084
Email: tjlodge50@yahoo.com

*Attorneys for Reno-Sparks Indian Colony and Summit Lake Paiute Tribe*

Rick Eichstaedt (Washington Bar No. 36487*)*
*[Will Comply with L.R. 1a 11-2 within 14 days]*
EICHSTAEDT LAW OFFICE, PLLC
421 W. Riverside Avenue. Suite 1004
Spokane, Washington 99201-0410
Telephone: (509) 251-1424
Email: rick@eichstaedtlaw.net

*Attorney for Burns Paiute Tribe*

Louis M. Bubala III, Bar No. 8974
KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501
Telephone:  (775) 852-3900
Facsimile:  (775) 327-2011
Email: lbubala@kcnvlaw.com

*Local Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| RENO-SPARKS INDIAN COLONY, a federally-recognized Tribe; SUMMIT LAKE PAIUTE TRIBE, a federally-recognized Tribe; BURNS PAIUTE TRIBE, a federally-recognized Tribe; | Case No. 3:23-cv-00070 |
| Plaintiffs, | **COMPLAINT FOR VACATURE AND INJUNCTIVE AND EQUITABLE RELIEF** |
| vs. | |
| DEB HAALAND, Secretary of the Interior; ANNE-MARIE SHARKEY, Acting Director of the Bureau of Land Management Winnemucca District Office; KATHLEEN REHBERG, Field Manager of the Bureau of Land Management Winnemucca District Humboldt River Field Office; | |
| Defendants. | |

**INTRODUCTION**

1.      This action is brought under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*; the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; their implementing regulations; and federal common law.  Plaintiffs, Reno-Sparks Indian Colony ("RSIC"), Summit Lake Paiute Tribe ("SLPT"), and the Burns Paiute Tribe ("BPT") (together "Plaintiffs"), challenge the Bureau of Land Management, Winnemucca District Office's ("BLM") actions and failures to act in approving physical harm to, and construction activities on, the Plaintiffs' National Register of Historic Places-eligible traditional cultural property in Lithium Nevada Corporation's ("LNC") Thacker Pass Lithium Mine Project ("the Project") Area.  Plaintiffs also allege that BLM breached the Memorandum of Agreement ("MOA") between the BLM and Nevada State Historic Preservation Officer regarding the Project.

2.      In the time since summary judgment briefing concluded in *Bartell Ranch LLC v. McCullough* (Case No. 3:21-cv-00080-MMD-CLB), LNC began construction in Thacker Pass, ostensibly under a number of permits that LNC reported in the Thacker Pass Lithium Mine Plan of Operations would be terminated upon authorization of the Thacker Pass ROD, issued on January 15, 2021.  On July 18, 2022, BLM also acknowledged that the September 12, 1865 massacre site was within the Thacker Pass Lithium Mine Project Area for purposes of NHPA review and consultation and initiated a "post- review discovery process" under 36 CFR § 800.13(b)(1). Without concluding the post-review discovery process or initiating the same processes for the older permits, BLM has allowed LNC to begin construction in Thacker Pass, and harm the Plaintiffs' traditional cultural property, under permits that were supposed to have been terminated upon the approval of the Thacker Pass ROD. BPT's and RSIC's claims, here,

are all rooted in BLM's post-ROD actions and failures to act and, therefore, were not – and, per the court, *could not* – be reviewed in *Bartell Ranch LLC v. McCullough.*

3. SLPT challenges BLM's pre-ROD actions and failures to act – especially BLM's misrepresentations that it had consulted with SLPT about Thacker Pass -- beginning in 2017. In November 2022, SLPT learned from the Nevada State Historic Preservation Office ("NV SHPO") that BLM misrepresented, in filings in *Bartell Ranch LLC v. McCullough*, the extent of NV SHPO's concurrences with BLM's NHPA determinations and withheld documentation about tribal consultation that NV SHPO specifically requested from BLM prior to the ROD.

4. Specifically, Plaintiffs challenge:

– BLM's failure to comply with the FLPMA by failing to terminate the King Valley Clay Mine Plan of Operations, Kings Valley Lithium Exploration Project Plan of Operations, the Quinn River Valley Test Wells Notice of Intent, and the Far East Notice of Intent, which is an express part of the Thacker Pass Lithium Mine Project Plan of Operations' terms and conditions, and by instead authorizing progressively more work under these permits that is harming the Plaintiffs' traditional cultural property before BLM has completed the NHPA Section 106 "post-review discovery process" under 36 C.F.R. § 800.13(b)(1) for any of the permits.

– BLM's failure, after initiating a post-review discovery consultation process under 36 C.F.R. § 800.13(b)(1), to make reasonable efforts to avoid, minimize, or mitigate adverse effects to the historic properties subject to the post-review discovery consultation process.

– BLM's failure to make a reasonable and good faith effort to consult with the Tribes to resolve adverse effects to historic properties, pursuant to 36 C.F.R. § 800.6 and § 800.13(b)(1).

– BLM's refusal to supplement the Thacker Pass Environmental Impact Statement despite significant new circumstances and information relevant to environmental concerns and bearing on the Project and its impacts.

5.    Plaintiff SLPT solely challenges:

– BLM's failure to consult with SLPT before issuing the ROD.

– BLM's failure to make a reasonable and good faith effort to identify historic properties in Thacker Pass and to identify Indian tribes to consult with before issuing the ROD.

– BLM's breach of the "Memorandum of Agreement Between the United States Department of the Interior Bureau of Land Management Winnemucca District Office and the Nevada State Historic Preservation Officer Regarding the Lithium Nevada Thacker Pass Project Humboldt County" ("MOA") by failing to initiate the MOA's dispute resolution process after SLPT invoked it.

## JURISDICTION

6.    This action arises under the laws of the United States and this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

7.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court may grant declaratory relief and additional relief, including an injunction pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705 and 706.

8.    BLM's failure to comply with the requirements of the FLPMA, NHPA, and NEPA is arbitrary, capricious, and not in accordance with the procedures required by law pursuant to the APA and is thus subject to judicial review. 5 U.S.C. §§701-706.

9.    BLM's failure to comply with the requirements of the FLPMA, NHPA, and NEPA also constitutes agency action that is unreasonably delayed and/or unlawfully withheld as provided by §706(1) of the APA and is thus subject to judicial review. 5 U.S.C. §§ 701-706.

10.     Federal law controls the MOA's interpretation because it was entered into pursuant to a federal scheme and BLM is a party. *Tyler v. Cuomo*, 236 F.3d 1124, 1134 (9th Cir. 2000).

**<u>VENUE</u>**

11.     Venue is proper in the District of Nevada pursuant to 28 U.S.C. §§ 1391(b) and (e). The BLM Winnemucca District Office; Defendant Anne-Marie Sharkey, as acting director of the Winnemucca District Office (and successor of former district manager Ester M. McCullough, who issued and signed the ROD); and Defendant Kathleen Rehberg, as field manager of the Humboldt River Field Office of the Winnemucca District Office, are located in Winnemucca in Humboldt County, Nevada. The Thacker Pass Lithium Mine Project is located in Humboldt County, Nevada. RSIC is located in Reno and Sparks in Washoe County, Nevada. SLPT's offices are located in Sparks in Washoe County, Nevada, and its reservation is within Humboldt County, Nevada.

**<u>PARTIES</u>**

12.     Plaintiff Reno-Sparks Indian Colony is a federally-recognized Tribe located in Reno and Sparks, Nevada. RSIC consists of 1,299 members from the Paiute, Shoshone, and Washoe Nations. The Thacker Pass Project is located within the traditional homelands of RSIC members. Thacker Pass is RSIC's traditional cultural property and RSIC attaches cultural and religious significance to Thacker Pass. (Ex. 1: Eben Decl., pg. 3)

13.     Plaintiff Summit Lake Paiute Tribe is a federally-recognized Tribe. SLPT's primary administrative office is located in Sparks, Nevada. The Tribe's reservation is surrounded by Humboldt County in northwest Nevada. The reservation is about 50 miles south of the Oregon state line, and about 70 miles east of the California line. The Thacker Pass Project is located within the traditional homeland of SLPT. Thacker Pass is SLPT's traditional cultural

property and SLPT attaches cultural and religious significance to Thacker Pass. (Ex. 2: Lone Eagle Decl., pg. 2).

14.     Plaintiff Burns Paiute Tribe is a federally-recognized Tribe headquartered in Burns, Oregon. BPT consists of 210 members. Since time immemorial, the Burns Paiute Tribe has used and occupied land in central-southeastern Oregon, northern Nevada, northwestern California, and western Idaho, including the Thacker Pass Area. The Thacker Pass Area is of significant cultural, religious, and historic significance to the BPT.  (Ex. 3: Teeman Decl.).

15.     All three Tribes have members who have direct cultural and economic connections to Thacker Pass. These tribal members practice ceremony, hunt and gather traditional foods and medicines, share oral histories involving Thacker Pass, observe artifacts created by their ancestors, and to teach their members and the public about the history and traditional lifeways of regional indigenous peoples. These tribal members plan on engaging in these activities in the future. (Ex. 1, pgs. 3-6; Ex. 2, pg. 3).

16.     Defendant Bureau of Land Management – and its Winnemucca District, Humboldt River Field Office – is the agency responsible for the preparation, approval, and delivery of the Thacker Pass Lithium Mine Project Record of Decision, the Memorandum of Agreement with the Nevada State Historic Preservation Officer, and compliance with FLPMA, NHPA, and NEPA.

17.     Defendant Anne-Marie Sharkey is acting district manager of the BLM Winnemucca District Office, successor of former district manager Ester M. McCullough (who issued and signed the ROD), and is sued in her official capacity.

18.     Defendant Kathleen Rehberg is field manager of the BLM Winnemucca District Office, Humboldt River Field Office and is sued in her official capacity.

/ / /

19.     Defendant Deb Haaland is the Secretary of the Interior and is sued in her official capacity.

### THACKER PASS TRADITIONAL CULTURAL DISTRICT AND 1865 MASSACRE SITE

20.     Thacker Pass is located within the traditional territories of the Northern Paiute and Western Shoshone peoples.

21.     The Plaintiffs' oral histories teach that the Creator placed them in their traditional territories "with the stones." This means the Plaintiffs believe their ancestors have lived in their traditional territories from time immemorial.

22.     The Plaintiffs attach historic, religious, and cultural significance to all of Thacker Pass, including all of what BLM has determined is the Thacker Pass Project Area of Potential Effects. (Ex. 4: Tribes' NRHP-eligibility Submission, pg. 4)

23.     All of Thacker Pass is the Plaintiffs' traditional cultural property. The Plaintiffs have informed BLM that Thacker Pass is a Traditional Cultural District, which encompasses all of the Thacker Pass Project Area of Potential Effects and September 12, 1865 massacre site. (Ex. 5: RSIC's June 3, 2021 letter to BLM, pg. 2; Ex. 6: RSIC's Aug. 5, 2022 letter to BLM pgs. 2-8; Ex. 7: SLPT's Oct. 31, 2022 letter to BLM, pg. 2)

24.     The Plaintiffs and their ancestors have camped, hunted, gathered traditional foods and medicine, traveled through, used the obsidian quarries, created tools and weapons, educated their youth, prayed, and performed ceremony in Thacker Pass. And, they intend to do so in the future.

25.     The Plaintiffs believe that Thacker Pass is a singularly powerful spiritual place blessed by the presence of their ancestors, other spirits, and golden eagles – whom they consider to be directly connected to the Creator.

26.     Thacker Pass was the site of two massacres of the Plaintiffs' ancestors – a terrible pre-European contact massacre, which Paiutes call the Peehee mu'huh Massacre, and the September 12, 1865 Massacre, where federal soldiers massacred at least 31 Paiutes in Thacker Pass. The Plaintiffs regularly gather in Thacker Pass to commemorate and pray for their ancestors killed in these massacres.

27.     Thacker Pass is a traditional safe haven for Paiute people. Sentinel Rock, a prominent geologic feature in Thacker Pass, as well as cave and stone outcroppings in Thacker Pass provided Paiutes with good lookout points to watch the surrounding land for miles. After the September 12, 1865 massacre and when American soldiers were rounding Paiutes up to force them onto reservations, Paiute people hid in Thacker Pass.

28.     Paiute people traditionally placed their dead in caves and stone outcroppings, including those in Thacker Pass. As such, caves and stone outcroppings are also generally considered sacred by Paiutes.

29.     Thacker Pass is home to many of the Plaintiffs' traditional foods. Some of the Plaintiffs' last choke cherry orchards are found in Thacker Pass. Thacker Pass is also a rich source of yapa (wild potatoes) and biscuit root. The Plaintiffs hunt groundhogs, rabbits, and mule deer in Thacker Pass. Mule deer are especially important to the Plaintiffs as a source of wild meat.

30.     The traditional medicines gathered by the Plaintiffs in Thacker Pass include ibi (a chalky rock used for ulcers and both internal and external bleeding) and toza root (an effective anti-viral medicine that Plaintiffs harvest to treat COVID-19). Obsidian gathered in Thacker Pass is also integral to traditional Paiute medicine. For example, Paiutes use the high-quality obsidian found in Thacker Pass to open and drain veins.

/ / /

## FLPMA AND UNNECESSARY AND UNDUE DEGRADATION

31.     The Federal Land Policy and Management Act directs that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). BLM's Surface Management Regulations define "unnecessary or undue degradation" as "conditions, activities, or practices that fail to comply with…the terms and conditions of an approved plan of operations…" 43 C.F.R. § 3809.5. Furthermore, the Surface Management Regulations explain to operators that "you prevent unnecessary or undue degradation while conducting operations on public lands by complying with…the terms and conditions of your notice or approved plan of operations…" 43 C.F.R. § 3809.415.

## FLPMA FACTUAL BACKGROUND

32.     On January 15, 2021, Ester M. McCullough, Bureau of Land Management, Winnemucca District Manager signed a "Plan of Operations Approval Decision Under Surface Management Regulations (943 C.F.R. § 3809) and Determination of Concurrence Under the Regulations Governing Use and Occupancy Under the Mining Laws (43 C.F.R. § 3715)." With that decision, Ms. McCullough approved the Plan of Operations and Reclamation Plan for LNC's Thacker Pass Mine project, case file NVN-098586, and explained that this Plan of Operations was included in the environmental impact statement. This Plan of Operations was attached as Exhibit B to the Final Environmental Impact Statement.

33.     Ms. McCullough specifically wrote: "It is my decision to approve the Plan of Operations NVN-098586, including compliance with the environmental protection measures specified in the Plan and those that are included with the ROD as Attachment A. Lithium Nevada Corporation may only perform those operations that have been described in their Plan, and must operate in accordance with the BLM's regulations at 43 C.F.R. § 3809."

3358700_1.docx  20079.1

34.     In the Thacker Pass Mine Plan of Operations, attached to the FEIS as Appendix B, LNC stated:

> "Disturbance which was created, or is active, after October 1, 1990, includes exploration roads and drill sites associated with the ongoing LNC drilling campaigns, specifically associated with the Kings Valley Lithium Exploration POO (N85255), the Far East NOI (NOI, N95396), and a small test pit mined under existing authorizations (Kings Valley Clay Mine [KMCM], N91547). Disturbance also took place to support the Quinn River Valley Test Well NOI (N94510), now called the Quinn Production Well. LNC intends to incorporate all existing disturbance into this Project. *Authorization of this POO and Plan will terminate the KVCM POO (N91547), Kings Valley Lithium Exploration Project (N85255), the Quinn River Valley Test Wells NOI (N94510), the Far East NOI (N95396) and all reclamation requirements.*"

(emphasis added) (FEIS, Appendix B, Section 2.2.6, pg. 4).

35.     LNC also stated:

> "LNC has permitted and performed mineral exploration activities within the Project area since 2007, including construction of drill sites, access roads, and a 114-acre hectorite clay mine (KVCM) that was never developed. The Kings Valley Lithium Exploration Project POO was analyzed under the Kings Valley Clay Mine Environmental Assessment (DOI-BLM-NV-W010-2010-0001-EA) and a Finding of No Significant Impact was signed (BLM 2010). The Kings Valley Clay Mine POO Project was analyzed under the Kings Valley Clay Mine Environmental Assessment (DOI-BLM-NV-WO10-20130046-EA) and a Finding of No Significant Impact was signed (BLM 2014). *LNC intends to incorporate all existing disturbance into this Project. Authorization of this Plan will terminate the KVCM POO (N91547), Kings Valley Lithium Exploration Project (N85255), Far East NOI (N95396), and the Quinn River Valley Test Wells NOI (N94510) and all reclamation requirements.*"

(emphasis added) (FEIS, Appendix B, Section 2.4, pg. 21).

36.     On August 19, 2022, in response to RSIC's repeated requests that no physical harm be done to the September 12, 1865 massacre site before the post-review discovery consultation concluded, BLM wrote to RSIC and explained that there was no disturbance or archaeological excavation planned for the September 12, 1865 massacre site. (Ex. 8: BLM's Aug. 19, 2022 letter to RSIC).

/ / /

37.     On December 16, 2022, the Plaintiffs obtained BLM records demonstrating that, instead of terminating the older permits as described in the Mine Plan of Operations, BLM has been granting approvals under these older permits that authorize progressively more damage to the Plaintiffs' traditional cultural property.

38.     For example, on January 4, 2009, BLM authorized the Kings Valley Lithium Exploration Project (N85255). The 2009 Environmental Assessment that BLM prepared for the Kings Valley Lithium Exploration authorizes 75 acres of disturbance within a 1,210-acre project area. It was estimated, at that time, that up to 20 tons of earth would be removed as part of the bulk sampling program (internal pgs. 2-4).

39.     However, the BLM records demonstrate that BLM has approved at least 13 modifications to the Kings Valley Lithium Exploration Project Plan, alone, since 2009. BLM calls these modifications "Work Plans." (Ex. 9: Kings Valley Lithium Exploration Project Work Plans, pg. 1). Under Work Plan #6, approved in October 2011, LNC was authorized to extract 3,000 tons of clay material from one bulk sample site and another 2,000 tons excavated from another bulk sample site (Ex. 9, pg. 38). Under Work Plan #10, approved in 2018, the Kings Valley Lithium Exploration Project Plan boundary was expanded to 3,549 acres (Ex. 9, pg. 27).

40.     None of these "Work Plan" modifications were mentioned or discussed in the Thacker Pass Lithium Mine Project Environmental Impact Statement.

41.     LNC requested the 13th Work Plan approval on November 15, 2022 and BLM provided approval on December 1, 2022. Under this 13th approval, LNC has been authorized to construct 22 new boreholes and 26 new test pits on previously undisturbed land within the Plaintiffs' traditional cultural property. LNC has also secured authorization for 10,411 "linear feet of new overland travel," which apparently refers to 2 miles of new access roadbed. When seeking this 13th approval, LNC stated "[t]he drilling and subsequent subsurface characterization

would provide valuable information for facility design associated with the proposed Thacker Pass Project."

42.     Similarly, in May 2014, BLM authorized the Kings Valley Clay Mine Project (N91547). On October 5, 2022, BLM approved a modification to the Kings Valley Clay Mine Project Plan of Operation that allows LNC to install a security camera trailer, add a new pipe gate, place concrete barriers on existing roads, and install new fencing. (Ex. 10: Kings Valley Clay Mine Project Modifications, pg. 3). And, as late as December 12, 2022, BLM received LNC's plans to complete work to install a pump to a water well, install associated equipment to run the well, erect more security fencing, and move a Connex (a type of large cargo container) to protect the well (Ex. 9, pg. 1).

## NHPA LEGAL BACKGROUND

### a.  *Section 106 Consultation, In General*

43.     The National Historic Preservation Act explicitly delegates authority to the Advisory Council on Historic Preservation to "promulgate such rules and regulations as it deems necessary to govern the implementation of section 106. 16 U.S.C. § 470s. These NHPA implementing regulations are codified at 36 Code of Federal Regulations 800 et seq. "[F]ederal agencies must comply with these regulations." *Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dept. of Interior*, 608 F.3d 592, 607 (9th Cir. 2010).

44.     "Section 106 of the National Historic Preservation Act requires Federal agencies to take into account the effects of their undertakings on historic properties…[t]he procedures in this part define how Federal agencies meet these statutory responsibilities." 36 C.F.R. § 800.1(a).

45.     "The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties…" 36 C.F.R. §

800.1(a).

46.     "Consultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f).

47.     "Historic property means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior…The term includes properties of traditional religious and cultural importance to an Indian tribe…and that meet the National Register criteria." 36 C.F.R. § 800.16(l)(1).

48.     "The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." 36 C.F.R. § 800.1(a).

49.     "The agency official must complete the section 106 process 'prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 36 C.F.R. § 800.1(c).

**b.  *Section 106 Tribal Consultation***

50.     "Section 101(d)(6)(B) of the act requires the agency official to consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking. This requirement applies regardless of the location of the historic property." 36 C.F.R. § 800.2(c)(2)(B)(ii).

51.     "It is the responsibility of the agency official to make a reasonable and good faith effort to identify Indian tribes…that shall be consulted in the section 106 process." 36 C.F.R. § 800.2(c)(2)(B)(ii)(A).

/ / /

52.     "The agency official shall ensure that consultation in the section 106 process provides the Indian tribe…a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(B)(ii)(A).

53.     "The agency official shall consult with representatives designated or identified by the tribal government...Consultation with Indian tribes…should be conducted in a manner sensitive to the concerns and needs of the Indian tribe..." 36 C.F.R. § 800.2(c)(2)(B)(ii)(C).

   c.   *Section 106 Historic Property Identification and Evaluation Efforts*

54.     "The agency official shall make a reasonable and good faith effort to carry out appropriate [historic properties] identification efforts…" 36 C.F.R. § 800.4(b)(1). *In Pueblo of Sandia v. U.S.*, the 10th Circuit interpreted what a "reasonable effort" under the NHPA implementing regulations is and stated: "a mere request for information is not necessarily sufficient to constitute the 'reasonable effort' section 106 requires." 50 F.3d 856, 860 (10th Cir. 1995).

55.     "The agency official shall acknowledge that Indian tribes and Native Hawaiian organizations possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them." 36 C.F.R. § 800.4(c)(1).

56.     "In consultation with the SHPO/THPO and any Indian tribe…that attaches religious and cultural significance to identified historic properties, the agency official shall apply the criteria of adverse effects to historic properties within the area of potential effects. The agency official shall consider any views concerning such effects which have been provided by consulting parties and the public." 36 C.F.R. § 800.5(a).

57. "Area of potential effects means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." 36 C.F.R. § 800.16(d).

58. "The agency official should seek the concurrence [on findings of adverse effects to historic properties] of any Indian tribe…that has made known to the agency official that it attaches religious and cultural significance to a historic property subject to the finding." 36 C.F.R. § 800.5(c)(2)(iii) (emphasis added).

**d.** ***Section 106 Post-Review Discovery Process***

59. "If historic properties are discovered or unanticipated effects on historic properties found after the agency official has completed the section 106 process under paragraph (a) of this section, the agency official shall make reasonable efforts to avoid, minimize or mitigate adverse effects to such properties." 36 C.F.R. § 800.13(b). And, "if the agency official has not approved the undertaking or if construction on an approved undertaking has not commenced, consult to resolve adverse effects pursuant to § 800.6." 36 C.F.R. § 800.13(b)(1).

60. "The agency official shall consult with the SHPO/THPO and other consulting parties, including Indian tribes and Native Hawaiian organizations, to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties." 36 C.F.R. § 800.6(a).

61. "Affording the SHPO an opportunity to offer input on potential historic properties would be meaningless unless the SHPO has access to available, relevant information. Thus, 'consultation' with the SHPO mandates an informed consultation." Pueblo of Sandia at 862. And, "[b]y withholding relevant information from the SHPO during the consultation process…the Forest Service further undermined any argument that it had engaged in a good faith effort." *Id.*

## NHPA FACTUAL BACKGROUND

62.    The Thacker Pass Lithium Mine Project Record of Decision was issued on January 15, 2021.

63.    BLM originally identified the Fort McDermitt Paiute Shoshone Tribe, the Summit Lake Paiute Tribe, and the Winnemucca Indian Colony as Tribes needing to be consulted about cultural resources that would be affected by the Thacker Pass Project. BLM did not discuss the Project with SLPT before issuing the ROD.

64.    On April 15, 2021, SLPT received an April 14, 2021 letter from the BLM Humboldt River Field Office requesting comments within 30 days of receipt on the finalized Historic Properties Treatment Plan ("HPTP") for the Project. (Ex. 11: BLM's April 14, 2021 letter to SLPT).

65.    On May 13, 2021, SLPT Chairwoman Randi Lone Eagle responded to BLM's April 14 letter and stated that "the Tribe's interest in and concern over the handling of archeological and cultural sites extends to the sites in question under the HPTP for the Project." She explained that "the Tribe strongly opposes the execution of any activities where cultural resources may be disturbed, including those listed." She expressed her disappointment that BLM's April 14 letter requesting information from the Tribe about cultural resources in Thacker Pass was "coming after decisions have already been made to move forward with the project" and she criticized the project's "poor track record of public notification and involvement" and the way "its approval was pushed through at the last minute by an outgoing administration." She concluded the letter by requesting formal consultation on the Project's HPTP. (Ex. 12: SLPT's May 13, 2021 letter to BLM, pgs. 1-2).

66.    The other two tribes – Fort McDermitt and the Winnemucca Indian Colony – similarly wrote letters stating they were not properly consulted about the Project in response to

BLM's April 14, 2021 letter, too (Ex. 13: Fort McDermitt and Winnemucca Indian Colony responses to BLM April 14, 2021 letter). These letters are not offered to assert the interests of non-party Tribes; they are offered to show that BLM misrepresented the extent of Tribal consultation to secure the NV SHPO's legally required concurrence. They are also offered to show that BLM's public-facing NEPA documents contain falsehoods.

67.     Fort McDermitt specifically stated,

"[T]he Tribes are very concerned that Lithium Nevada's HPTP was developed and approved absent any Tribal input and government-to-government consultation…Therefore, the HPTP is in no way reflective of the Tribal value we have on our cultural, historical, and religious resources at the Thacker Pass area, which are now being slated to be erased and destroyed – with BLM's approval – by Lithium Nevada's Project."

(Ex. 13, pg. 4).

68.     The Winnemucca Indian Colony similarly stated,

"We are surprised and concerned that both, the BLM and the Nevada State Historic Preservation Office, have approved the Historic Properties Treatment Plan (HPTP) to mitigate impacts to archaeological sites in the mine's Plan of Operations (PoO) boundary without any talks or discussions with the Winnemucca Indian Colony. We are concerned that you [sic] document "Final Formatted LNC Thacker HPTP" on page 47, states that consultation was held with the Winnemucca Indian Colony beginning in 2017 and continues to date. We believe that it is not true, and that BLM or others have NOT consulted with the Winnemucca Indian Colony regarding this proposed project."

(Ex. 13, pg. 2).

69.     Despite not consulting with any Tribe about the Thacker Pass Project prior to issuing the ROD, BLM stated in letters sent to NV SHPO seeking concurrences on various cultural resource determinations on December 16, 2019; January 23, 2020; March 16, 2020; and June 10, 2020 that "Tribal consultation with the Fort McDermitt Paiute-Shoshone Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony began in 2017 and is ongoing for the current undertaking." (Ex. 14: BLM letters to NV SHPO Seeking Concurrence, pgs. 6; 9; and 11).

70.     Based on BLM's false representation, the Nevada State Historic Preservation Office ("SHPO") wrote in response to each of these letters that "SHPO notes that tribal consultation has been initiated per Sections b and V.A.4 of the Protocol…As the BLM states consultation will continue with the tribes regarding this undertaking; please continue to forward summaries of consultation efforts for the SHPO administrative record." (Ex. 15: NV SHPO Responses to BLM about Concurrence, pgs. 3 and 7).

71.     BLM did not forward summaries of these consultation efforts. In an email written to other SHPO staff, Rebecca L. Palmer, the Nevada State Historic Preservation Officer wrote that BLM has "not provided us with a summary of the results of the consultation as we requested. It is the results of the consultation that documents the federal agency's identification efforts. As the federal agency is required to determine the scope of the identification effort in consultation with the SHPO, and this scope includes consultation with Tribes, we should receive a summary of these efforts. I suspect once the current State Archaeologist leaves, we will receive this information more frequently." (Ex. 16: NV SHPO Sept. 7, 2021 email, pg. 1).

72.     Then again, on August 28, 2020, and November 2, 2020, in order to secure SHPO's concurrence on the Thacker Pass Historic Properties MOA, BLM stated, "Tribal consultation with the Fort McDermitt Paiute-Shoshone Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony regarding the Thacker Pass project began in 2017. The BLM has met with tribes to discuss the project and has provided information and requested information from tribes on several occasions including before and during the NEPA process."

73.     This above statement is false. BLM did not meet with any Tribes to discuss the project during the Thacker Pass NEPA process.

74.     On September 29, 2021, in an email to the Advisory Council on Historic Preservation ("ACHP") about concerns the public brought to the ACHP about BLM's handling

of tribal consultation for the Thacker Pass Project, the NV SHPO wrote:

> From the information you provided today [that BLM gave ACHP when confronted by the ACHP about tribal consultation], the BLM has documentation related to the identification of properties with traditional religious and cultural significance that was not provided by [to] my office despite our repeated requests for a summary. As I have indicated, such a summary would have included some information related to the nature of resources, dates of consultation, nature of comments provided by tribal governments (not including information deemed confidential by the Tribe). Keep in mind that none of the documentation we were provided included any descriptions of the activities the BLM was undertaking that you received. Neither the MOA nor the HPTP contain any reference to these efforts as my office was never informed of these activities. Just as in the Yellow Pine case, we request information, and the request is ignored. The ACHP requests the same information, and this information is provided without hesitation. We are not able to provide our assistance if the agency does not disclose information necessary for us to make an informed decision.
>
> As requested, here are the documents related to the Thacker Pass project in order of submission or production. Please note, this is also one of those projects where the inventories had originally been submitted as exempt from SHPO review, so we only sent them to our inventory with no review. Once the Adverse Effect was identified, the agency was obliged to request our review of all the previous inventories in one letter. Meaning, in this, that we had a stack of paper at least two feet high to review in one 30-day period. With this type of needless overload of the system, we will be requesting some form of throttling provision to avoid this 'report dumping' that, intentionally or otherwise, overwhelms our limited review capacity. The Justice [sic] Du decision in [sic] also attached where the BLM stated that we 'signed off' on their tribal consultation (page 17) which in no way represents what our review of a CRINA entails.

(Ex. 17: NV SHPO Sept. 29, 2021 email to ACHP, pg. 2).

### a.  *Post-Review Discovery Process*

75.    Plaintiffs attach religious, cultural, and historical significance to all of Thacker Pass, including all of the Thacker Pass Lithium Mine Project Area. All of Thacker Pass is the Plaintiffs' traditional cultural property.

76.    One of the events that makes all of Thacker Pass religiously, culturally, and historically significant to the Plaintiffs is the September 12, 1865 massacre that happened in Thacker Pass.

/ / /

77.     BLM failed to identify the September 12, 1865 Thacker Pass Massacre Site that will be adversely affected by the Project before issuing the ROD despite possessing documentation of the 1865 massacre in its own General Land Office records.

78.     On April 14, 2021, BLM sent letters to Fort McDermitt, Summit Lake, and the Winnemucca Indian Colony notifying the Tribes of the Historic Properties Treatment Plan that BLM finalized on November 5, 2020. All three of these Tribes responded by criticizing BLM's failure to consult with them.

79.     The statement from a letter sent by a non-party Tribe included here is not offered to assert the interests of that non-party Tribe; it is offered because the reasonableness of BLM's post-review discovery efforts depends in part upon the extent of the post-review information provided to BLM. This letter is part of that information.

80.     On April 19, 2021, the Winnemucca Indian Colony informed BLM that the Winnemucca Indian Colony believed that the Thacker Pass Project might desecrate or destroy religious and traditional sites and areas of cultural importance (Ex. 13, pg. 2).

81.     On May 13, 2021, SLPT responded to BLM's April 14, 2021 letter and requested formal consultation on the Project's HPTP. SLPT told BLM that "the Tribe strongly opposes the execution of any activities where cultural resources may be disturbed, including those listed [in the HPTP]." SLPT stated that "[i]t is disappointing that the April 14 letter requesting this information is coming after decisions have already been made to move forward with the project." (Ex. 12, pgs. 1-2).

82.     SLPT specifically objected to BLM's request that comments on the already finalized HPTP be provided within 30 days. SLPT wrote, "By now the Bureau of Land Management should know that Tribes often lack the internal capacity and resources to adequately review documents and provide substantive feedback, especially within the short

timeframes allotted." And, "Requesting comments within 30 days on a document that is so detailed and complex is an unreasonable expectation." (Ex. 12, pg. 2).

83.     On June 3, 2021, the Reno-Sparks Indian Colony informed BLM that RSIC considers all of Thacker Pass RSIC's traditional cultural property and asked BLM to stop any plans to disturb Native American cultural resources or historic properties in Thacker Pass. (Ex. 5).

84.     Also on June 3, 2021, the Pyramid Lake Paiute Tribe wrote to BLM requesting BLM halt any construction activities as part of the Thacker Pass Project be halted until meaningful government-to-government consultation with Pyramid Lake and all of the Tribes that are connected to Thacker Pass has concluded. Pyramid Lake stated, "we have not be [sic] contacted or consulted about this project what-so-ever." (Ex. 18, Pyramid Lake Paiute Tribe's June 3, 2021 letter to BLM).

85.     On June 16, 2021, the Burns Paiute Tribe informed BLM that the Tribe attaches religious, cultural, and historical significance to Thacker Pass. After describing a number of significant sites in Thacker Pass, BPT stated, "Destroying these sites destroys our history. And, it makes us wonder if an underlying motivation for this mine is to destroy the historical evidence of the genocide perpetrated against our people." BPT requested consultation about the Thacker Pass Project that construction operations be stopped while this consultation was ongoing. (Ex. 19, BPT's June 16, 2021 letter to BLM).

86.     On June 24, 2021, the People of Red Mountain, a group of Fort McDermitt tribal members who were raised traditionally and who maintain their traditional practices, wrote to inform BLM of Thacker Pass' religious, cultural, and historical significance. The People of Red Mountain criticized BLM for failing to consult with federally-recognized Tribes and requested that BLM do so before any physical disturbance was allowed to happen in Thacker Pass. (Ex. 20:

PoRM's June 24, 2021 letter to BLM, pg. 2).

87.     BLM did not provide any of this information to SHPO or the Advisory Council on Historic Preservation.

88.     On July 28, 2021 and August 18, 2021, RSIC again told BLM that RSIC considers Thacker Pass a Traditional Cultural Property TCP eligible for inclusion on the National Register of Historic Places. (Ex. 21: RSIC's letters to BLM between July 28, 2021 and Oct. 1, 2021, pg. 1).

89.     On August 19, 2021, RSIC presented BLM with the U.S. Deputy Surveyor Palmer's 1868 Field Notes Journal describing the September 12, 1865 Thacker Pass massacre located in BLM's own General Land Office records.

90.     On September 10, 2021, RSIC presented BLM with the accounts of the massacre found in The Autobiography of William D. Haywood; Gregory Michno's The Deadliest Indian War in the West: The Snake Conflict, 1864-1868; and Myron Angel's History of Nevada published in 1881. BLM did not provide this information to SHPO or ACHP.

91.     On October 1, 2021, RSIC presented BLM with the September 30, 1865 account of the massacre in the Owyhee Avalanche newspaper. BLM did not provide this information to SHPO or ACHP.

92.     On October 12, 2021, the ACHP wrote to BLM with a number of concerns regarding BLM's tribal consultation process for the Thacker Pass Project. The ACHP advised BLM that the section 106 regulations "require that, when an agency is presented with new information regarding a previously unidentified historic property or effect, it must consult on the eligibility of that property and whether the undertaking would adversely affect it." (Ex. 22: ACHP's letters to BLM, pg. 2). ACHP stated, "Considering the information shared with the

BLM and ACHP on the massacre site, it is unclear why the BLM has not acted on this information…and the ACHP recommends it do so at this time." (Ex. 22, pg. 2).

93.    ACHP noted "that this location may have significance to contemporary tribal communities even absent tangible remnants of the massacre. The place itself, identifiable through its natural and physical features, may continue to inform the cultural practices, identities, and histories of these tribes, and therefore conveys significance, albeit painful or not widely known or disseminated. Therefore, continued consultation and integration of traditional knowledge is paramount for evaluating the eligibility of this property." (Ex. 22, pg. 2).

94.    ACHP advised, "Because the HPTP was developed and finalized before the Agreement was executed, it may be necessary to amend the Agreement to incorporate and document any changes to the discovery plan and resolution measures…Once the BLM has fulfilled these procedural requirements and committed itself to any necessary resolution measures, it could proceed with implementing the undertaking." (Ex. 22, pg. 2).

95.    Referencing SHPO's September 29, 2021 email, ACHP also noted problems with BLM's consultation with SHPO. ACHP wrote, "[T]he SHPO has informed the ACHP that substantive information on tribal consultation is routinely withheld from them, which is problematic considering the SHPO's role in providing concurrence on the eligibility of historic properties which may be of significance to Indian tribes off tribal lands." (Ex. 22, pg. 3).

96.    This letter was not shared with the Plaintiffs until the ACHP provided them the letter on August 22, 2022.

97.    On November 3, 2021, BLM informed SHPO that BLM would comply with the post-review discovery process described at 36 C.F.R. § 800.13(b)(1) for "an Indian village noted on the 1869 GLO plat" that "is in the indirect effects APE." However, BLM did not communicate to SHPO the Tribes' position that all of Thacker Pass is a traditional cultural

property eligible for the National Register of Historic Places, the Tribes' insistence that the massacre site extends across the Thacker Pass Project Area, or the Tribes' request that BLM evaluate all of Thacker Pass as a traditional cultural property. Nor did BLM share the other historical accounts of the massacre RSIC had provided to BLM, which show that the massacre occurred over a large area in Thacker Pass. Instead, regarding the massacre site's location, BLM only told SHPO that "this site sits on private land." (Ex. 23: BLM's letters to ACHP/NV SHPO re: Post-Review Discoveries).

98.     On November 16, 2021, BLM similarly informed ACHP that BLM would comply with the post-review discovery process described at 36 C.F.R. § 800.13(b)(1). Again, without informing ACHP of the Tribes' position about traditional cultural property and the extent of the massacre site or of the other historical accounts of the massacre RSIC had provided to BLM, BLM told ACHP, "The ACHP must realize since the site is located on private land is not being developed as part of the mining project, BLM's ability for mitigation is limited."

99.     Experts on designating massacre sites have disagreed with BLM's restriction of the 1865 massacre site to such a small area, arguing that a massacre site is much larger than just the place where the murdered went to sleep the night they were murdered. (Ex. 4, pgs. 77-79).

100.     On March 17, 2022, because SHPO reported a number of persistent problems with the manner in which BLM conducts and documents its section 106 reviews, ACHP met with BLM staff to discuss these problems. After this meeting, ACHP wrote to BLM and SHPO on April 28, 2022 to document ACHP's findings including that "[i]nstead of attempting to consult to resolve these issues on a case-by-case or programmatic basis, the BLM often simply ignores or fails to respond to many of the comments and requests for information raised by the SHPO." (Ex. 22, pg. 5).

101.    ACHP also told BLM that BLM's position on not responding to comments "is particularly problematic when it comes to determinations of eligibility for potential historic properties for listing in the National Register." (Ex. 22, pg. 5). ACHP reminded BLM that determinations about which resources are eligible for NRHP listing as historic properties "are determinations an agency cannot make unilaterally but must rather consult with the SHPO/THPO and any Indian tribes that attach religious and cultural significance to the identified properties." (Ex. 22, pg. 5) (emphasis with original).

102.    On July 18, 2022, BLM, noting "a post-review discovery of an 'Indian village' and massacre site in the indirect area of potential effects," wrote to the Plaintiffs "to consult on site eligibility for the National Register of Historic Places (NRHP) eligibility for [four archaeological sites discovered after BLM performed a post-review Class III survey near the Indian village] and the 'Indian village' and massacre site."  (Ex. 24, BLM's July 18, 2022 letter Starting Post-Review Discovery Process with the Tribes, pg. 1).

103.    In this letter, BLM told the Tribes, "In accordance with 36 CFR 800.13, the BLM, the State Historic Preservation Office (SHPO), and the Advisory Council on Historic Preservation (ACHP), reached an agreement in which a Class III survey of the un-surveyed BLM land would be conducted and would be used in determining the eligibility of the Indian village and massacre site." (Ex. 24, pg. 1).

104.    However, this statement was not true. On September 2, 2022, SHPO wrote to ACHP. SHPO quoted BLM's statement above about reaching an agreement for a Class III survey and called it "a false statement made by the BLM." SHPO also stated that "no such agreement exists with the SHPO. The BLM should not make, or have made, any assumption of agreement by my office with the proposal under any circumstances." (Ex. 25: NV SHPO's Sept. 2, 2022 email to ACHP, pg. 1).

105.    On August 5, 2022, RSIC responded to BLM's July 18 letter. In a lengthy, detailed letter, RSIC once again asserted that all of Thacker Pass is eligible for the National Register of Historic Places as a traditional cultural or historic district and that RSIC attaches significance to all of Thacker Pass for its association with the September 12, 1865 massacre. RSIC summarized the documentation provided to BLM about the Thacker Pass traditional cultural district and the September 12, 1865 massacre site. RSIC specifically objected to the way BLM limited the extent of the 1865 massacre site to the Indian village on private land. RSIC also specifically requested that all archaeological digging, construction work, or other physical disturbance in Thacker Pass be suspended until NRHP-eligibility determinations could be made for Thacker Pass and the massacre site; until adverse effects and ways to avoid, minimize, or mitigate adverse effects to these properties could be determined in consultation with the Tribes; and until a supplemental Environmental Impact Statement and revised Historic Properties Treatment Plan could be prepared by BLM, in consultation with the Tribes. (Ex. 6).

106.    On August 17, 2022, SLPT wrote to BLM to support RSIC's August 5 letter and to request that no work happen in the Thacker Pass APE so that NRHP-eligibility remain unaffected and subsequent consideration of alternatives to avoid, minimize or mitigate the Project's adverse effects on any historic properties can be determined. (Ex. 26: SLPT's Aug. 17, 2022 letter to BLM).

107.    On August 19, 2022, BLM sent another letter to RSIC. BLM failed to acknowledge RSIC's assertions that all of Thacker Pass is RSIC's traditional cultural property and that the 1865 massacre site extends well beyond the Indian village on private property that BLM contemplated. (Ex. 8, BLM's Aug. 19, 2022 letter to RSIC).

108.    Instead of acknowledging RSIC's special expertise in identifying RSIC's own traditional cultural property, BLM wrote again that "the massacre site is on private land and not

under the jurisdiction of the BLM." BLM also wrote, "As you know, the survey of the additional 100 acres on public land adjacent to the private land, which is the location of the 1865 massacre…" However, this directly contradicted both RSIC's special expertise and the historical documentation RSIC provided BLM about the massacre site. (Ex. 8, pg. 1).

109.    BLM did acknowledge RSIC's request to prevent physical disturbance in Thacker Pass until the post-review discovery process could conclude. BLM stated, "Please be aware that there is no disturbance or archaeological excavation that is planned for the five sites that were identified in our letter to you." (Ex. 8, pg. 1).

110.    However, just a few weeks later, on September 9, 2022, counsel for LNC informed all counsel in *Bartell Ranch LLC v. McCullough*, No. 3: 21-cv-00080-MMD-CLB (D. Nev.) that LNC would be performing some bulk sampling under its Kings Valley Lithium Exploration Project Plan of Operations. (Ex. 27, LNC's Sept. 9, 2022 email to Parties).

111.    LNC, not BLM, notified the parties of this work. This was the first time that the Plaintiffs learned that the permits that the approved Thacker Pass Lithium Mine Plan of Operations declared would be terminated upon approval were not actually terminated. Instead, BLM had been approving work under these older permits that would adversely affect the Plaintiffs' traditional cultural property in Thacker Pass before BLM concluded the NHPA section 106 post-review discovery process.

112.    On September 11, 2022, RSIC and SLPT emailed BLM objecting to any physical disturbance in Thacker Pass and seeking more specific information about what work LNC was approved to do so that RSIC and SLPT could assess effects to their traditional cultural property, and inquiring whether BLM would allow any other work under any other permits. (Ex. 28, Email exchange between RSIC/SLPT re: Old Permits, pgs. 1-3).

/ / /

113.    BLM responded on September 15, 2022, but only provided an obsolete version of the 2009 Kings Valley Lithium Exploration EA and directed RSIC and SLPT to contact LNC for any questions about the work being conducted under the 2009 Kings Valley Lithium Exploration Plan (Ex. 28, pgs. 4-5).

114.    During the week of September 12, 2022, without notifying the Plaintiffs, through new "Work Plan" modifications pertaining to the Kings Valley Lithium Exploration Plan and Kings Valley Clay Mine Plan, LNC began bulk sampling and other work in Thacker Pass that BLM had authorized.

115.    On September 17, 2022, BLM Humboldt River Field Office staff joined a SLPT Tribal Council meeting to discuss, among other things, the Thacker Pass Project. SLPT, through its counsel that SLPT had specifically designated and identified as its representative for Thacker Pass consultation, attempted to ask BLM about the work LNC had recently notified SLPT's counsel about. However, BLM refused to answer these questions or discuss the Thacker Pass Project with SLPT while SLPT's counsel was present. Consequently, SLPT was unable to obtain more information from BLM about work LNC was authorized to do under the older permits.

116.    On September 22, 2022, BLM sent a letter to RSIC. In this letter, for the first time, after Will Falk had been representing RSIC in consultation with BLM about the Thacker Pass Project for over a year, BLM asked if Falk represented RSIC in consultation. Despite all of the information that RSIC had provided BLM about RSIC's traditional cultural property in Thacker Pass, BLM simply made another request for consultation. (Ex. 29, BLM's Sept. 22, 2022 letter to RSIC, pg. 2).

117.    On October 11, 2022, ACHP again wrote to the BLM Winnemucca District Office with a number of concerns about the way BLM was conducting the Thacker Pass NHPA section 106 post-review discovery process. (Ex. 22, pgs. 8-11).

118.     ACHP found that BLM had withheld information from ACHP, "In meetings and correspondence, RSIC has shared extensive documentation with the ACHP which has revealed other concerns, including those expressed separately by the Winnemucca Indian Colony (WIC) that were not shared previously with the ACHP." (Ex. 22, pg. 9).

119.     ACHP noted that:

> "RSIC has expressed that the BLM's primary focus on archaeological survey to document and evaluate the massacre site ignores the greater significance of this place *and* event to the ongoing cultural traditions of RSIC, and potentially other Indian Tribes. In multiple letters to the BLM, RSIC has related the significance of the Thacker Pass region, recounting how the tribe's 'ancestors have hunted and gathered traditional foods and medicines, gathered obsidian to make arrowheads and other tools, and performed ceremony [sic] in Thacker Pass for thousands of years."

(Ex. 22, pg. 9).

120.     ACHP explained, "In meetings with the ACHP, the BLM has rebutted these statements by questioning the lack of physical evidence associated with the massacre within the APE, in addition to questioning the accuracy of the secondary accounts of the massacre cited by RSIC."

121.     To address this, ACHP wrote:

> The ACHP would like to remind the BLM that a federal agency does not have the expertise to determine whether a property is of religious or cultural significance to a Tribe, or whether it has an integral relationship to the traditional cultural practices or beliefs of Tribe. Nor can a federal agency determine whether a property retains sufficient integrity to continue to communicate that significance to a Tribe. These are determinations that require the special expertise of the Tribe.

(Ex. 22, pg. 9).

122.     The ACHP also specifically criticized BLM's practice of withholding information about tribal consultation from SHPO. Referring to its October 12, 2021 letter, in which ACHP expressed concerns with this practice, ACHP wrote:

> We also observed in our earlier letter that this approach is problematic considering the SHPO's role in providing concurrence on the eligibility of historic properties which may be of significance to Indian Tribes off Tribal lands. Therefore, we herein reiterate our request that the BLM consult with the SHPO to determine what level of information is necessary from Indian Tribes and other consulting parties to ensure the SHPO has an adequate basis for understanding the BLM's eligibility determinations and other findings…

(Ex. 22, pg. 11).

123. BLM did not respond to ACHP's letter.

124. On October 12, 2022, BLM wrote to NV SHPO about field work summaries BLM conducted in the Plaintiffs' traditional cultural property and the 1865 massacre site in Thacker Pass. Despite all of the information provided by the Plaintiffs, BLM informed SHPO that "[t]he only comment received was from the Reno-Sparks Indian Colony who said they could not review the letter reports in 30 days." (Ex. 30, BLM's Oct. 12, 2022 letter to NV SHPO, pg. 2).

125. Because BLM, in its September 22 letter, failed once again to respond to many of RSIC's requests and questions, RSIC wrote to BLM again on October 18, 2022 with several questions including if BLM rejected RSIC's special expertise and assertion that land significant to RSIC associated with the 1865 massacre extends across Thacker Pass and the whole Area of Potential Effects and whether BLM will revise the HPTP to reflect all of the new information that has been presented to BLM by RSIC, other Tribes, and the public. (Ex. 31, RSIC's Oct. 18, 2022 letter to BLM, pgs. 1-5).

126. BLM did not respond to RSIC's October 18, 2022 letter.

127. On October 31, 2022, SLPT wrote to BLM and invoked the dispute resolution process described at Stipulation V of the MOA with a number of objections. BLM never acknowledged SLPT's letter invoking this dispute resolution process and subsequently never consulted with SLPT to resolve the dispute. (Ex. 7, SLPT's Oct. 31, 2022 Letter to BLM).

128.     On November 3, 2022, after RSIC specifically informed BLM that it considered the properties at issue to be NRHP-eligible, BLM notified SHPO that it determined that these properties were not NRHP-eligible. BLM failed to inform SHPO about RSIC's position on these properties. (Ex. 32, BLM's Nov. 3, 2022 letter to NV SHPO).

129.     Inexplicably, in this November 3 letter, after BLM had informed ACHP, SHPO, and the Tribes that it was following the 36 C.F.R. § 800.13(b)(1) post-review discovery process, BLM reported to NV SHPO that "this project is under-threshold." Under-threshold is not a term found in 36 C.F.R. § 800 et seq. and is, instead, a term used in the BLM-SHPO State Protocol Agreement, which does not apply to BLM's obligations under 36 C.F.R. § 800.13(b)(1).

130.     Upon reviewing this November 3 letter from BLM, ACHP emailed BLM stating, "As you know there are no thresholds in the regulations that would exempt an undertaking from completing the Section 106 review process…" and, "because these determinations are being conducted as part of a larger undertaking for which an MOA was executed, I question whether these thresholds would apply in this case." (Ex. 33, Emails amongst BLM/NV/SHPO/ACHP Re: Under Threshold Determinations, pg. 3).

131.     ACHP also noticed BLM's failure to describe the Tribes' position to NV SHPO and wrote, "Reno-Sparks Indian Colony and Summit Lake Paiute Tribe have expressed significant concern to the ACHP, both regarding the undertaking itself but also the methodology used to document the massacre site." (Ex. 33, pg. 3).

132.     On November 8, 2022, SHPO responded to BLM's November 3 letter and withheld concurrence that the subject historic properties were not NRHP-eligible. SHPO wrote:

> The HPTP is a negotiated and legally-binding document attached to the MOA as Appendix C. Any modifications to the mitigation described in that HPTP required consultation with the SHPO prior to implementation. The SHPO has no record of any consultation with the BLM for the modifications to the HPTP for the above four (4) historic properties.

(Ex. 34, NV SHPO's Nov. 8, 2022 letter to BLM, pg. 2).

133.    On November 17, 2022, Cedric Streater, BLM Humboldt River Archaeologist responded to ACHP's questions about BLM's sudden switch to the under-threshold determination as opposed to proceeding under 36 § 800.13(b)(1). Streater clarified that it was a mistake to state the Project would be regulated under any thresholds and that the Project was following 36 C.F.R. § 800.13(b)(1). (Ex. 33, pg. 3).

134.    Then, on November 18, 2022, without copying any of the Tribes, Kathleen Rehberg, Humboldt River Field Manager, informed ACHP that instead of following 36 C.F.R. § 800.13(b)(1), BLM would "be going forward with the regulations under 36 C.F.R. § 800.13(b)(3)." Rehberg falsely stated that BLM would proceed under 36 C.F.R. § 800.13(b)(3) based on RSIC's request to incorporate the previous two Plans of Operations into the unanticipated discovery process. (Ex. 33, pg. 2).

135.    RSIC made no such request. In fact, RSIC had specifically requested that BLM proceed under 36 § 800.13(b)(1) (Ex. 28, pgs. 1-2). The post-review discovery process described at 36 § 800.13(b)(3) is truncated and only gives Tribes 48 hours to provide comments about post-review discoveries.

**BREACH OF CONTRACT**

136.    The "Memorandum of Agreement Between the United States Department of the Interior Bureau of Land Management Winnemucca District Office and the Nevada State Historic Preservation Officer Regarding the Lithium Nevada Thacker Pass Project Humboldt County" was executed on November 5, 2020. (Ex. 35: MOA).

137.    This MOA was "mutually agreed by BLM and the SHPO that the Project will be implemented in accordance with the following stipulations in order to take into account the effects of the Project on the historic properties."

138.   "A memorandum of agreement executed and implemented pursuant to this section evidences the agency official's compliance with section 106 and this part and shall govern the undertaking and all of its parts. The agency official shall ensure that the undertaking is carried out in accordance with the memorandum of agreement." 36 C.F.R. § 800.6(c).

*139.*   The MOA is a contract and BLM is bound by its terms. See Battle Mountain Band of the *Te-moak Tribe of Western Shoshone Indians v. BLM*, 302 F.Supp.3d 1226, 1235 (D. Nev. 2018); see also *Tyler v. Cuomo*, 236 F.3d 1124, 1134 (9th Cir. 2000) (holding that a memorandum of agreement entered into by a city "is a contract" and that "the City is bound by its terms" where the city entered into the MOA to satisfy its NEPA and NHPA requirements). Federal law controls the MOA's interpretation because it was entered into pursuant to a federal scheme and BLM is a party. *Id.*

140.   SLPT is listed as a concurring party to the MOA.

141.   Stipulation V states:

"Should any signatory or concurring party object to any proposed actions or to the way the terms of this MOA are implemented, BLM shall consult with the objecting party to resolve the objection. If either the objecting party or BLM determines the objection cannot be resolved, the following actions may be taken:

1.   BLM shall forward all the documentation relevant to the dispute to the ACHP. The ACHP shall provide BLM and the objecting party its advice on resolution of the objection within 30 days of receipt of adequate documentation. Prior to reaching a final decision on the dispute, BLM shall prepare a written response that takes into account the advice provided by the ACHP and any comments from signatories or concurring parties to this MOA. BLM shall provide the written response to all signatories and concurring parties. BLM shall then proceed        according        to        its        final        decision.

2.   If the ACHP does not provide advice regarding the dispute within 30 days, BLM may make a final decision provided it has taken into account the comments provided by the signatories and concurring parties. BLM shall provide all parties and ACHP with the final written decision and proceed accordingly.

3.  BLM's responsibility to carry out all other actions subject to the terms of this MOA that are not the subject of a dispute will remain unchanged."

(Ex. 35, pg. 5).

142.    On October 31, 2022, SLPT wrote to BLM and invoked the dispute resolution process described at Stipulation V of the MOA with a number of objections. BLM never acknowledged SLPT's letter invoking this dispute resolution process and never consulted with SLPT to resolve the dispute. BLM's failure to address SLPT's invocation of the MOA's dispute resolution process has deprived SLPT of the dispute resolution consultation required by the MOA and amounts to a violation of its contractual obligations. (Ex. 7).

## NEPA VIOLATION

143.    The National Environmental Policy Act requires federal agencies to prepare an EIS for "all major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). And, "Agencies shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii).

144.    An agency is required to supplement an existing EIS if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." CEQ regulations, 40 C.F.R. § 1502.9(c).

145.    The discovery of the September 12, 1865 massacre site and the Thacker Pass Traditional Cultural District as well as the discovery that no consultation took place with SLPT despite BLM reporting that it had in multiple NEPA documents including the Draft and Final EIS and the ROD are significant new information relevant to environmental concerns that have a

bearing on the Project and its impacts.

146.     In *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989), the Supreme Court explained that under the "rule of reason," "a supplemental EIS must be prepared" when an action will affect the quality of the environment "in a significant manner or to a significant extent not already considered." *Id.* at 374; see also *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (supplemental impact statement is "required where new information provides a seriously different picture of the environmental landscape" (*quoting City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 274 (D.C. Cir. 2002))); *Davis v. Latschar*, 202 F.3d 359, 369 (D.C. Cir. 2000) (requiring a supplemental impact statement for "changes that cause effects which are significantly different from those already studied"). "The overarching question is whether an EIS's deficiencies are significant enough to undermine informed public comment and informed decisionmaking." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).

## FIRST CLAIM FOR RELIEF
### (FLPMA Violations)

147.     Plaintiffs incorporate by reference the allegations of all the foregoing paragraphs as if fully set forth herein.

148.     BLM's failure to ensure that the Kings Valley Clay Mine Plan of Operations, Kings Valley Lithium Exploration Project Plan of Operations, the Quinn River Valley Test Wells Notice of Intent, and the Far East Notice of Intent is causing unnecessary and undue degradation of public lands, violates FLPMA, and is unlawful.

149.     BLM's approval of new "Work Plans" under the Kings Valley Clay Mine Plan of Operations, Kings Valley Lithium Exploration Project Plan of Operations, the Quinn River Valley Test Wells Notice of Intent, and the Far Eastern Notice of Intent is causing unnecessary

and undue degradation of public lands, violates FLPMA, and is unlawful.

**SECODN CLAIM FOR RELIEF**
**(NHPA Violations)**

150.    Plaintiffs incorporate by reference the allegations of all the foregoing paragraphs as if fully set forth herein.

151.    The Summit Lake Paiute Tribe claims that BLM's failure to consult with the Tribe, and failure to make a reasonable and good faith effort to identify Indian tribes to consult with, before issuing the ROD violates NHPA and is unlawful.

152.    The Summit Lake Paiute Tribe claims that BLM's failure to make a reasonable and good faith effort to identify historic properties in Thacker Pass violates NHPA and is unlawful.

153.    All of the Plaintiffs claim that BLM's failure after initiating a post-review discovery consultation process under 36 C.F.R. § 800.13(b)(1), to make reasonable efforts to avoid, minimize, or mitigate adverse effects to the historic properties subject to the post-review discovery consultation process violates NHPA and is unlawful.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract)**

154.    Plaintiffs incorporate by reference the allegations of all the foregoing paragraphs as if fully set forth herein.

155.    The Summit Lake Paiute Tribe claims that BLM breached the MOA by failing to initiate the MOA's dispute resolution process after the Summit Lake Paiute Tribe invoked this dispute resolution process, which is unlawful.

/ / /

/ / /

## FOURTH CLAIM FOR RELIEF
### (NEPA Violation)

156.    Plaintiffs incorporate by reference the allegations of all the foregoing paragraphs as if fully set forth herein.

157.    BLM's refusal to supplement the Thacker Pass Environmental Impact Statement despite significant new circumstances and information relevant to environmental concerns and bearing on the Project and its impacts violates NEPA and is unlawful.

## PRAYER FOR RELIEF

158.    WHEREFORE, for all the foregoing reasons, Plaintiffs request that this Court issue:

159.    A judgment declaring that BLM's activities connected to plans for physical disturbance of Thacker Pass, pursuant to the Thacker Pass Lithium Mine Project Record of Decision and Plans of Operations; Thacker Pass Historic Properties Treatment Plan; Kings Valley Clay Mine Plan of Operations; Kings Valley Lithium Exploration Plan of Operations; the Quinn River Valley Test Wells Notice of Intent; and/or the Far East Notice of Intent, fail to comply with FLPMA, NHPA, and NEPA.

160.    A judgment declaring that BLM's violations of FLPMA, NHPA, and NEPA were arbitrary, capricious, and not in accordance with the procedures by law pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 through 706.

161.    A judgment declaring that BLM failed to comply with FLPMA, NHPA, and NEPA, and that such failure constitutes agency action that is unreasonably delayed and/or unlawfully withheld as provided by the Administrative Procedure Act,  5 U.S.C. § 706(1).

162.    A judgment and order enjoining BLM from authorizing any physical disturbance in Thacker Pass pending compliance with FLPMA, NHPA, and NEPA.

163.   A judgment and order ordering BLM to specifically perform the terms and conditions of the MOA.

164.   A judgment granting Plaintiffs their costs and reasonable attorneys' fees incurred in bringing this action, pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 et seq. and any other applicable statutory or equitable principles.

165.   Any other relief this Court deems just and proper.

Respectfully submitted this
16 February 2023

By:   */s/ Will Falk*
_____
Will Falk (Utah Bar No. 16678)
*[Will Comply with L.R. 1a 11-2 within 14 days]*

Terry J. Lodge (Ohio Bar No, 29271)
*[Will Comply with L.R. 1a 11-2 within 14 days]*

*Attorneys for Reno-Sparks Indian Colony and Summit Lake Paiute Tribe*
_____
EICHSTAEDT LAW OFFICE, PLLC

By:   */s/ Rick Eichstaedt*
_____
Rick Eichstaedt (Washington Bar No. 36487*)*
*[Will Comply with L.R. 1a 11-2 within 14 days]*

*Attorney for Burns Paiute Tribe*
_____
KAEMPFER CROWELL

By:   */s/ Louis M. Bubala III*
_____
Louis M. Bubala III, Bar No. 8974

*Local Counsel for Plaintiffs*