TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ARWYN CARROLL (MA Bar 675926)
MICHAEL ROBERTSON (DC Bar 1017183)
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0465
Fax: (202) 305-0275
arwyn.carroll@usdoj.gov
michael.robertson@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| RENO-SPARKS INDIAN COLONY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DEBRA HAALAND, Secretary of the Interior, *et al.*,<br><br>Defendants. | Case No. 3:23-cv-70-MMD-CLB<br><br>**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Fed. Defs' Opp'n to Mot. for Prelim. Inj.

# TABLE OF CONTENTS

BACKGROUND ..................................................................................................... 2

    I.      BLM consulted about Thacker Pass beginning at least in 2006 ..................... 2

    II.     BLM consulted with SLPT before approving the Project ............................. 3

    III.    The Memorandum of Agreement and HPTP ................................................ 4

    IV.    BLM continues consultation in light of post-review identification of historic properties............................................................................................. 4

LEGAL STANDARD ............................................................................................. 7

    I.      A preliminary injunction is an extraordinary remedy .................................. 7

    II.     The National Historic Preservation Act ....................................................... 7

    III.    The Federal Land Policy and Management Act ........................................... 9

    IV.    Administrative Procedure Act review of agency action................................ 9

ARGUMENT ....................................................................................................... 10

    I.      Plaintiffs may not obtain an injunction before serving the complaint........... 10

    II.     Plaintiffs have not demonstrated a likelihood of success on the merits........ 10

        A.     SLPT is not likely to succeed on its breach of contract claim............ 10

            1.     The United States has not waived sovereign immunity ......... 11

            2.     SLPT is not a party to the MOA .......................................... 11

            3.     BLM has complied with the MOA ....................................... 12

        B.     Plaintiffs are not likely to succeed on their claim under FLPMA...... 13

        C.     SLPT is not likely to succeed on its claims challenging the pre-approval NHPA process ................................................................ 16

            1.     BLM made reasonable efforts to consult with SLPT before approving the Project........................................................... 16

            2.     BLM afforded SLPT a "reasonable opportunity" to consult ................................................................................ 17

            3.     BLM consulted with the Nevada SHPO .............................. 18

D.     Plaintiffs' claims challenging the post-review discovery process are not ripe ...................................................................................... 20

III.    Plaintiffs have not demonstrated imminent, irreparable harm ..................... 22

IV.    The balance of hardships and public interest merge and weigh against an injunction ................................................................................................... 23

CONCLUSION ........................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................. 7

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ............................................................................. 10

*Bartell Ranch LLC v. McCullough*,
  558 F. Supp. 3d 974 (D. Nev.) ........................................................... 5, 18

*Bartell Ranch LLC v. McCullough*, No. 3:21-cv-80-MMD-CLB,
  2023 WL 1782343 (D. Nev. Feb. 6, 2023) .................................. 1, 2, 3, 11, 16

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ............................................................... 22

*Conservation Cong. v. U.S. Forest Serv.*,
  720 F.3d 1048 (9th Cir. 2013) ............................................................... 7

*Ctr. for Competitive Politics v. Harris*,
  784 F.3d 1307 (9th Cir. 2015) ............................................................... 7

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ............................................................. 23

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ............................................................... 24

*eBay Inc. v.MercExchange, LLC*,
  547 U.S. 388 (2006) ......................................................................... 23

*GECCMC 2005–C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*,
  671 F.3d 1027 (9th Cir. 2012) ............................................................. 11

*Havasupai Tribe v. Provencio*,
  906 F.3d 1155 (9th Cir. 2018) ............................................................. 23

*Jackson v. Hayakawa*,
  682 F.2d 1344 (9th Cir. 1982) ............................................................. 10

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ................................................................. 9

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ........................................................................... 9

*Lydo Enterprises, Inc. v. Las Vegas*,
  745 F.2d 1211 (9th Cir. 1984) ............................................................. 22

*Matthews v. San Diego Cnty. Bd. of Supervisors*,
   No. 3:18-CV-711-GPC-NLS, 2019 WL 1793356 (S.D. Cal. Apr. 24, 2019) .................. 24

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ............................................................................................. 7

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................. 10

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ................................................................................. 7

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) ............................................................................................. 22

*Native Ecosystems Council v. Dombeck*,
   304 F.3d 886 (9th Cir. 2002) ................................................................................. 10

*Nevada v. Dep't of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) ................................................................................. 20

*Pueblo of Sandia v. United States*,
   50 F.3d 856 (10th Cir. 1995) ................................................................................. 19

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of the Interior*
   927 F. Supp. 2d 921 (S.D. Cal. 2013) ...................................................................... 17

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of the Interior*,
   755 F. Supp. 2d 1104 (S.D. Cal. 2010) .................................................................... 17

*Rattlesnake Coal. v. U.S. E.P.A.*,
   509 F.3d 1095 (9th Cir. 2007) ............................................................................. 9, 20

*Star Alaska v. United States*,
   14 F.3d 36 (9th Cir. 1994) .................................................................................... 11

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................................. 22

*Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*,
   496 F. App'x 712 (9th Cir. 2012) ............................................................................ 8

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
   608 F.3d 592 (9th Cir. 2010) ................................................................................. 17

*Tough Traveler, Ltd. v. Outbound Prods.*,
   60 F.3d 964 (2d Cir. 1995) .................................................................................... 22

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
   136 F.3d 641 (9th Cir. 1998) ................................................................................. 11

*Winter v. Nat. Resources Def. Council*,
   555 U.S. 7 (2008) ............................................................................................. 7, 22

*Zepeda v. U.S. I.N.S.*,
     753 F.2d 719 (9th Cir. 1983) ...................................................................................... 10

**Statutes**

28 U.S.C. § 2501 ............................................................................................................. 15

43 U.S.C. § 1732(b) ......................................................................................................9, 14

54 U.S.C. § 306108 ............................................................................................................ 7

**Regulations**

36 C.F.R. § 63 .................................................................................................................... 6

36 C.F.R. § 63.2 ................................................................................................................. 6

36 C.F.R. § 800.13 ........................................................................................................... 15

36 C.F.R. § 800.13(b) .....................................................................................................5, 6

36 C.F.R. § 800.13(b)(1) ...............................................................................................6, 20

36 C.F.R. § 800.13(b)(3) ...............................................................................................6, 21

36 C.F.R. § 800.16(l)(1) ..................................................................................................... 8

36 C.F.R. § 800.2(c)(2)(ii) ..........................................................................................8, 9, 16

36 C.F.R. § 800.2(c)(2)(ii)(A) .........................................................................................8, 9

36 C.F.R. § 800.3 ............................................................................................................... 8

36 C.F.R. § 800.4(b) ......................................................................................................... 18

36 C.F.R. § 800.4(b)(1) ...................................................................................................... 8

36 C.F.R. § 800.5(d)(2) ...................................................................................................... 8

36 C.F.R. § 800.6 ............................................................................................................. 23

36 C.F.R. § 800.6(c) ......................................................................................................... 11

36 C.F.R. § 800.6(c)(1) ..................................................................................................... 11

36 C.F.R. § 800.6(c)(2) ..................................................................................................... 11

36 C.F.R. § 800.6(c)(3) ..................................................................................................... 12

36 C.F.R. § 800.6(c)(8) ..................................................................................................... 13

43 C.F.R. § 3809.11(a) ...................................................................................................9, 15

43 C.F.R. § 3809.2(a) ......................................................................................................... 9

43 C.F.R. § 3809.21 .......................................................................................................... 15

43 C.F.R. § 3809.312 ........................................................................................................ 15

43 C.F.R. § 3809.312(c) .................................................................................................... 15

43 C.F.R. § 3809.412 ............................................................................................ 15

43 C.F.R. § 3809.552(a) ......................................................................................... 9

43 C.F.R. § 3809.582 .............................................................................................. 9

**Other Authoritiesa**

85 Fed. Reg. 45,651-01 (July 29, 2020) ............................................................... 4

## TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| APA | Administrative Procedure Act |
| APE | Area of Potential Effect |
| BLM | Bureau of Land Management |
| BPT | Burns Paiute Tribe |
| DEIS | Draft Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| HPTP | Historic Properties Treatment Plan |
| MOA | Memorandum of Agreement |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| RSIC | Reno-Sparks Indian Colony |
| SHPO | State Historic Preservation Officer |
| SLPT | Summit Lake Paiute Tribe |
| TCD | Traditional Cultural District |

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 1 | BLM Winnemucca Field Office RMP, Ethnographic Assessment (Excerpt) [TPNHPA-0003][1] |
| 2 | West Lithium Kings Valley Clay Mine Environmental Assessment (Excerpt) [TPEIS-0288] |
| 3 | December 12, 2019 Scoping Letter from BLM to SLPT |
| 4 | Thacker Pass Scoping Report App'x C (Excerpt) [TPEIS-0169] |
| 5 | April 10, 2020 Interim Guidance Memorandum |
| 6 | July 29, 2020 DEIS Letter from BLM to SLPT |
| 7 | Thacker Pass Project Draft Environmental Impact Statement (Excerpt) [TPEIS-0312] |
| 8 | Thacker Pass Project Final Environmental Impact Statement (Excerpt) [TPEIS-0384] |
| 9 | November 30, 2020 letter from BLM to SLPT |
| 10 | Thacker Pass Project Record of Decision [TPEIS-0452] |
| 11 | Declaration of Mark Hall and Exhibit A (HPTP Except) |
| 12 | August 28, 2020 letter from BLM to SLPT |
| 13 | Second Declaration of Mark Hall |
| 14 | November 16, 2021 letter from BLM to ACHP |
| 15 | July 18, 2022 letters from BLM to SLPT and BPT |
| 16 | January 3, 2023 email from BLM to Falk |
| 17 | February 27, 2023 letter from ACHP to BLM |
| 18 | 2014 BLM-State Historic Preservation Officer State Protocol Agreement |
| 19 | March 13, 2023 letter from BLM to SLPT |
| 20 | November 12, 2021 letter from RSIC to SHPO |
| 21 | December 7, 2021 letter from SHPO to RSIC |

---

[1] Excerpts of the relevant portions of Exhibit Nos. 1, 2, 4, 7 and 8 are attached to this memorandum. Complete copies can be found in the administrative record filed in *Bartell Ranch v. McCullough*, No. 3:21-cv-80, at the record document numbers indicated in this table. The Court and counsel for all parties have full copies of that record.

Three federally recognized Tribes[2] challenge the U.S. Bureau of Land Management's (BLM) January 2021 decision approving the two plans of operations that form Lithium Nevada Corporation's Thacker Pass Project. All three Tribes disclaimed an interest in the Thacker Pass area in prior communications with BLM and remained silent about its cultural and historical importance for decades. They chose instead to assert their interest for the first time six months *after* BLM approved the Thacker Pass Project—despite agency approvals of other projects in that area dating back to 2009. Notwithstanding this delay, once Plaintiffs finally offered their views on the cultural and historical importance of the Thacker Pass area, BLM treated it as a post-review discovery and is engaged in the resulting NHPA consultation process. Despite this ongoing administrative process, Plaintiffs have brought a new action on the heels of the Court's decision rejecting RSIC's and BPT's claims under the National Historic Preservation Act (NHPA) and National Environmental Policy Act (NEPA) in *Bartell Ranch LLC v. McCullough*, No. 3:21-cv-80-MMD-CLB, 2023 WL 1782343 (D. Nev. Feb. 6, 2023), and seek yet another preliminary injunction. That request should be denied.

As an initial matter, no injunction can issue until personal jurisdiction is established through service of the complaint. Even were that overcome, Plaintiffs cannot demonstrate a likelihood of success on any of their claims. First, Congress has not waived sovereign immunity for breach of contract claims seeking injunctive relief, Summit Lake Paiute Tribe (SLPT) is not a party to the Memorandum of Agreement (MOA) at issue, and it cannot demonstrate breach. Second, Plaintiffs' claim under the Federal Land Policy and Management Act (FLPMA) ignores essential elements of BLM's surface-use-authorization process. Third, BLM afforded SLPT a reasonable opportunity to consult on the Project before the Record of Decision (ROD) issued. Fourth, Plaintiffs' claims challenging the post-review discovery consultation process are not ripe. Finally, Plaintiffs do not even argue a likelihood of success under NEPA. But even were they likely to succeed on any one of these

---

[2] The Reno-Sparks Indian Colony (RSIC), Burns Paiute Tribe (BPT), and Summit Lake Paiute Tribe (SLPT).

claims, Plaintiffs' request for *preliminary* injunctive relief comes too late and the balance of hardships and public policy weigh against such relief.

## BACKGROUND

The factual and procedural history of BLM's approval of Lithium Nevada's Thacker Pass Project is detailed across the extensive briefing and the Court's orders in *Bartell Ranch v. McCullough*, No. 3:21-cv-80, and *Western Watersheds Project v. BLM*, No. 3:21-cv-103. Federal Defendants thus focus only on background relevant to the new claims raised by Plaintiffs.

## I.   BLM consulted about Thacker Pass beginning at least in 2006

BLM's efforts to consult with tribes about uses of public lands in the Thacker Pass area date back to at least 2006. It reached out to all three Plaintiffs, among others, when developing an ethnography in connection with preparation of the Winnemucca Resource Management Plan (RMP), which was ultimately approved in 2015. RSIC provided input into the ethnography while BPT disclaimed interest in the area. *Bartell Ranch*, 2023 WL 1782343 at *20. And while SLPT indicated it would participate in a meeting in Reno, no representative from SLPT appeared at that meeting and SLPT never responded to BLM's letters or follow-up telephone calls.[3] Similarly, when BLM attempted to consult with SLPT before approving the Kings Valley Clay Project in 2014, the Tribe indicated that it "felt the project was outside their immediate area of interest and wanted to use their time and resources to comment on projects closer to their reservation."[4] Ultimately, as the Court has already acknowledged, no Tribe "identified the Thacker Pass area as either sacred or a massacre site," in connection with BLM's review of the Kings Valley Clay Project, or in connection with four other "projects implicating the Project area" between 2010 and 2017, or at any time before the ROD for the Thacker Pass Project issued in January 2021. *Bartell Ranch*, 2023 WL 1782343, at *20–21.

---

[3] Ex. 1, Winnemucca Field Office RMP, Ethnographic Assessment at 88.

[4] Ex. 2, West Lithium Kings Valley Clay Mine Environmental Assessment at 84.

Fed. Defs' Opp'n to Mot. for Prelim. Inj.                                        2

## II.     BLM consulted with SLPT before approving the Project

While "BLM made a reasonable decision not to consult RSIC or Burns Paiute Tribe on the Project before issuing the ROD," *Bartell Ranch*, 2023 WL 1782343, at *22, BLM *did* identify SLPT for consultation. BLM attempted to initiate formal consultation with SLPT via a December 12, 2019 letter, requesting the Tribe's assistance "in identifying the cultural values, religious beliefs, sacred places, and traditional practices of Native American people which could be affected by [BLM] actions on public lands, and where feasible to seek opinions and agreement on measures to protect those tribal interest."[5] BLM did not receive any letters or comments from any tribe or tribal member during the scoping process regarding historic properties in the Thacker Pass area.[6]

On April 10, 2020, the Office of the Secretary of the United States Department of the Interior issued guidance concerning the COVID-19 pandemic and public participation. The Office of the Secretary instructed that, in light of the availability of virtual public involvement, "[i]n most cases COVID-19 should not delay NEPA compliance for bureau proposed actions."[7] Around the same time, the website for the Advisory Council for Historic Preservation (ACHP) advised that response deadlines under the NHPA "will be considered paused while, due to the COVID-19 outbreak, an office is closed or work conditions are such" that the Tribes "are unable to carry out their Section 106 duties or statutory rights to consultation in a timely fashion."[8] But the ACHP did not identify the source of its authority to "pause" regulatory deadlines, which BLM employees noted was "questionable."[9]

BLM did not cease its outreach. It forwarded the Draft Environmental Impact Statement (DEIS) to SLPT on July 29, 2020, once more requesting the Tribe's assistance.[10]

---

[5] Ex. 3, Dec. 12, 2019 letter from BLM to SLPT.

[6] Ex. 4, Thacker Pass Scoping Report at 5 and App'x C.

[7] Ex. 5, April 10, 2020 Interim Guidance. Memorandum at 2.

[8] Pls.' Mot. for Prelim. Inj. ("Mot.") Ex. 4 at 2, April 13, 2020 BLM emails, ECF No. 19-4.

[9] *Id.*

[10] Ex. 6, July 29, 2020 letter from BLM to SLPT.

In its public notice of availability of the DEIS, BLM again invited "tribes and other stakeholders . . . to participate in the comment process." 85 Fed. Reg. 45,651-01 (July 29, 2020). The DEIS addressed COVID-19 concerns, allowing for virtual public meetings in light of COVID-19.[11] And, in fact, BLM held its public meetings virtually on August 19 and 20, 2020.[12] BLM reached out to SLPT again on November 30, 2020, forwarding the Final Environmental Impact Statement (FEIS) again seeking the same assistance.[13] SLPT never responded to any of these overtures—whether substantively or otherwise.

## III.    The Memorandum of Agreement and HPTP

After completing its NHPA review, BLM, in consultation with the Nevada State Historic Preservation Office (SHPO), determined that the Thacker Pass Project would have an adverse effect on a number of historic properties within the Project's area of potential effect (APE).[14] On November 5, 2020, BLM and the SHPO signed an MOA, which approved the Historic Properties Treatment Plan (HPTP) for mitigating those effects. As the MOA itself states, BLM notified SLPT and others about the Project and "offered the Tribes the opportunity to be concurring parties" to the MOA in August 2020, but no Tribe ever responded or signed the MOA.[15] The HPTP also invited tribal representatives to participate, but at the time of its approval, "none of the consulted Native American groups [had] raised any questions or comments or presented issues with the Project."[16]

## IV.    BLM continues consultation in light of post-review identification of historic properties

In April 2021, BLM reached out to SLPT to ask if any sites slated for treatment under

---

[11] Ex. 7, DEIS Excerpt at 6-2.

[12] Ex. 8, FEIS Excerpt at 6-22.

[13] Ex. 9, November 30, 2020 letter from BLM to SLPT.

[14] Ex. 10, ROD at 5–6; *see also* Ex. 11, Declaration of Mark E. Hall ¶ 4.

[15] Compl. Ex. 35, MOA at 1, 8, ECF No. 3; Ex. 12, Aug. 28, 2020 letter from BLM to SLPT; Ex. 13, Second Declaration of Mark E. Hall ¶ 5.

[16] Ex. 11, Hall Decl. Ex. A (HPTP) at 47.

the HPTP had religious or cultural significance to the Tribe.[17] In response, SLPT asked BLM to prevent surface disturbance to *any* land within the Thacker Pass area despite the Tribe's stated reluctance to share that information with BLM and despite its silence during the NHPA consultation period.[18] In June 2021, RSIC and BPT raised their historic and cultural interest in the Thacker Pass area for the first time, citing a massacre that evidence suggests occurred around 1865 near the Project site—but outside the Project's direct APE—*i.e.*, the area of physical disturbance.[19] *See Bartell Ranch LLC v. McCullough*, 558 F. Supp. 3d 974, 986 (D. Nev.), *reconsideration denied*, 570 F. Supp. 3d 945 (D. Nev. 2021). The Court rejected the Tribes' motion for a preliminary injunction against activity under the HPTP. *Id.* at 977.

BLM did not ignore this new information about the Tribes' historical and cultural interest in the Thacker Pass area, however. Though the NHPA consultation period for the Thacker Pass project had already closed, BLM invited RSIC and BPT to consult on the permit necessary for carrying out the HPTP. Soon thereafter, it instituted its post-review discovery procedures—that is, the process for when "historic properties are discovered or unanticipated effects on historic properties found after the agency official has completed the section 106 process[.]"[20] 36 C.F.R. § 800.13(b). If the project has not yet been approved or construction begun, BLM "consult[s] to resolve adverse effects pursuant to" the NHPA's

---

[17] Compl. Ex. 11, Apr. 14, 2021 letter from BLM to SLPT, ECF No. 3.

[18] Compl. Ex. 12, May 13, 2021 letter from SLPT to BLM, ECF No. 3.

[19] *See* Compl. Ex. 5, June 3, 2021 letter from RSIC to BLM, ECF No. 2; Compl. Ex. 19, June 16, 2021 letter from BPT to BLM, ECF No. 3. RSIC and BPT subsequently intervened in the *Bartell Ranch* litigation, asserting claims under the NHPA and NEPA. SLPT asked for all ground disturbance to cease in May 2021 and August 2022, but did not raise the massacre site issue until October 31, 2022. *See* Compl. Ex. 7, Oct. 31, 2022 letter from SLPT to BLM, ECF No. 2; Compl. Ex. 12, May 13, 2021 letter from SLPT to BLM; Compl. Ex. 27, Aug. 17, 2022 letter from SLPT to BLM.

[20] BLM informed the SHPO and ACHP of its plans to engage the post-review discovery process under § 800.13(b) in November 2021. Compl. Ex. 32, Nov. 3, 2021 letter from BLM to SHPO, ECF No. 3; Ex. 14, Nov. 16, 2021 letter from BLM to ACHP. BLM invited the Tribes' consultation on this effort in July 2022. Compl. Ex. 24, Jul. 18, 2022 letter from BLM to RSIC, ECF No. 3; Ex. 15, July 18, 2022 letters from BLM to SLPT and BPT.

Section 106 consultation process. *Id.* § 800.13(b)(1). The regulations provide a more truncated process if the project has been approved and construction has commenced. *Id.* § 800.13(b)(3). After some confusion and discussion with the ACHP, BLM clarified that it was addressing the new information received about the 1865 massacre site under the § 800.13(b)(1) process.[21] BLM has been in communication with the ACHP about that process now since November 2021 and with the Plaintiffs since July 2022. That process is ongoing.

On February 3, 2023, SLPT and RSIC submitted a proposal for establishing a Traditional Cultural District (TCD) in Thacker Pass under 36 C.F.R. § 63.2.[22] BLM responded on February 23, agreeing that the proposed TCD "is eligible for the National Register of Historic Places under Criterion A" and seeking additional consultation to determine its boundaries and to "understand more about how [it] may be eligible under Criterion D."[23] At the same time, BLM indicated that the post-review discovery process remains ongoing and set out the steps necessary for its completion.[24] Importantly, nothing in 36 C.F.R. § 800.13(b) or 36 C.F.R. § 63 permits BLM to suspend existing authorizations—such as the Thacker Pass ROD—or to preclude construction under those authorizations while these processes play out.[25]

---

[21] *See* Compl. Ex. 33, Nov. 2022 emails, ECF No. 3; Ex. 16 Jan. 3, 2023 email and letter from BLM to Falk; Mot. Ex 2, Feb. 23, 2023 letter from BLM to RSIC, ECF No. 19-2. In short, BLM initially planned to proceed under § 800.13(b)(1). After RSIC requested cessation of ground disturbance under the Previous Authorizations—for which construction *had* begun—BLM considered using the § 800.13(b)(3) process but ultimately reevaluated and determined that it would continue and complete the process under § 800.13(b)(1).

[22] *See* Compl. Ex. 4, TCD Eligibility Statements, ECF No. 2.

[23] Mot. Ex. 4 at 1–2.

[24] *Id.* at 2.

[25] Indeed, even when suggesting expedited SHPO review, the ACHP did not suggest any halt in ground disturbance despite acknowledging that construction would soon begin. *See* Ex. 17, Feb 27, 2023 letter from ACHP to BLM. Though the ACHP references a "notice to proceed," no notice to proceed was required for construction approved under the ROD once the financial guarantee was accepted.

## LEGAL STANDARD

### I.      A preliminary injunction is an extraordinary remedy

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Resources Def. Council*, 555 U.S. 7, 24 (2008) (citation omitted). To obtain this extraordinary remedy, Plaintiffs must carry "the heavy burden of making a 'clear showing' that [they are] entitled to a preliminary injunction." *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015). The question here is thus not whether there is a good reason why an injunction should *not* be issued; rather, a court must determine that an injunction *should* issue. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157–58 (2010).

A plaintiff seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter*, 555 U.S. at 20, 22). Alternatively, in the Ninth Circuit, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction," along with irreparable injury and the public interest elements. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). Under either test, a deficiency in any one of the required elements precludes extraordinary relief. *Winter*, 555 U.S. at 24.

### II.      The National Historic Preservation Act

The NHPA sets forth procedural requirements for federal agencies to "take into account the effect of [an] undertaking on any historic property." 54 U.S.C. § 306108. The NHPA, like NEPA, "is a stop, look, and listen provision that requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (internal citations omitted). The regulations governing federal agency compliance with the NHPA consultation process, are codified at 36 C.F.R. Part 800.

Pursuant to a National Programmatic Agreement, in Nevada, the procedures set forth in 36 C.F.R. § 800.3 through § 800.7 have been replaced with the 2014 BLM-State Historic Preservation Officer State Protocol Agreement ("Protocol").[26] Once BLM has determined that an agency action is an "undertaking," it: (1) identifies the "historic properties" within the area potentially affected by the undertaking that are listed or eligible for listing on the National Register; (2) evaluates the proposed undertaking's effects on those properties; and (3) considers measures to avoid, mitigate, or minimize those effects, if any were found.[27] At various steps, the agency, after making "a reasonable and good faith effort to identify Indian tribes" that attach religious and cultural significance to historic properties that may be affected by the undertaking, must consult with the tribes. 36 C.F.R. § 800.2(c)(2)(ii)(A).

The Protocol directs BLM to undertake "project-specific surveys and other efforts" to reasonably identify historic properties, including the documentation of previous adequate inventories of the area of potential effects.[28] Other efforts "may include background research, consultation, oral history interviews, sample field investigation, and field survey" and "shall take into account past planning, research and studies." 36 C.F.R. § 800.4(b)(1). The NHPA regulations' good-faith standard, however, does not require the agency to use all of those techniques. *Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 F. App'x 712, 715 (9th Cir. 2012). If the agency finds the undertaking will adversely affect historic properties, it engages in further consultation regarding the resolution of any such effects.[29]

For engagement with Native American tribes, the Protocol defers to 36 C.F.R. § 800.2(c)(2)(ii).[30] Accordingly, the agency must "consult with any Indian tribe . . . that

---

[26] Ex. 18, BLM-State Historic Preservation Officer State Protocol Agreement. The Protocol was amended in 2021 to extend its term to 2026.

[27] Protocol §§ I, V.A, V.C, V.F; 36 C.F.R. §§ 800.3–800.6; *see also id.* § 800.16(l)(1) (defining "historic property").

[28] Protocol § V; *id.* at § V.A.3.b.

[29] Protocol § V.F; 36 C.F.R. § 800.5(d)(2).

[30] Protocol at 2.

attaches religious and cultural significance to historic properties that may be affected by an undertaking." 36 C.F.R. § 800.2(c)(2)(ii). The agency must "make a reasonable and good faith effort to identify" such tribes or organizations. *Id.* § 800.2(c)(2)(ii)(A). The agency must then provide the tribe "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id.*

### III.   The Federal Land Policy and Management Act

FLPMA requires that, in managing the public lands, the Secretary of the Interior "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). This standard governs how BLM manages surface disturbance connected with mining operations on the public lands through its regulations at 43 C.F.R. subpart 3809. Those regulations, which apply (with exceptions not relevant here) to "all operations authorized by the mining laws on public lands," *id.* § 3809.2(a) , require an approved "plan of operations" before mining operations or exploration causing more than five acres of surface disturbance can begin, *id.* § 3809.11(a) . They also require an operator to provide a financial guarantee sufficient to cover the estimated cost of reclamation, which must be maintained until replaced with another guarantee or until BLM releases it after reclamation is complete. 43 C.F.R. §§ 3809.552(a), 3809.582.

### IV.   Administrative Procedure Act review of agency action

Where a statute—such as the NHPA, NEPA, and FLPMA—does not provide for a private right of action, the Administrative Procedure Act (APA), provides for judicial review of the merits for challenges to agency actions. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990). But the agency's action must be final before the Court may review it— "[a]bsent *final* agency action, there [is] no jurisdiction in the district court to review" a claim. *Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1104 (9th Cir. 2007) (emphasis added).

Such review is highly deferential. *Lands Council v. McNair*, 537 F.3d 981, 992–94 (9th

Cir. 2008). Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation omitted). An agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and choice made. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

### I.     Plaintiffs may not obtain an injunction before serving the complaint

"Defendants must be served in accordance with Rule 4[ ] of the Federal Rules of Civil Procedure, or there is no personal jurisdiction." *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982). A federal court may not issue an injunction unless it "has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). But Plaintiffs have not completed service here. Plaintiffs' counsel merely emailed a courtesy copy of the complaint to Federal Defendants' counsel on February 28, 2023, which is not effective service of the complaint on the United States or its agencies or officers.[31] Service must be effected in accordance with Rule 4(i). As of this filing, the United States Attorney's Office for the District of Nevada has not been served. The Court thus lacks personal jurisdiction over Federal Defendants and may not issue injunctive relief.

### II.    Plaintiffs have not demonstrated a likelihood of success on the merits

Because Plaintiffs have not demonstrated a likelihood of success on any of their claims, they are not entitled to preliminary injunctive relief.

#### A.     SLPT is not likely to succeed on its breach of contract claim

SLPT contends that BLM breached the MOA by not initiating that agreement's

---

[31] The undersigned is not authorized to accept or waive service on behalf of the United States or its agencies or officers.

dispute resolution process when SLPT invoked it.[32] Even assuming that the MOA is an enforceable contract, SLPT cannot succeed on this claim for several reasons.

### 1.     The United States has not waived sovereign immunity

Sovereign immunity bars a claim seeking injunctive relief under a breach-of-contract theory against the United States. The United States is immune from suit except where Congress has waived its immunity. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 644 (9th Cir. 1998). Plaintiffs seek equitable relief in the form of specific performance as a remedy for this claim.[33] But "the APA does not waive sovereign immunity for contract claims seeking [equitable] relief." *N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994); *see also Tucson Airport*, 136 F.3d at 646–47. Plaintiffs have demonstrated no waiver of sovereign immunity or alleged any other vehicle for this claim, and thus are not likely to succeed on it.

### 2.     SLPT is not a party to the MOA

Even if the Court found sovereign immunity waived here, SLPT's claim is barred because it is not a party to the MOA. It is a fundamental principle of contract law "that only a party to a contract or an intended third-party beneficiary may sue to enforce the terms of a contract or obtain an appropriate remedy for breach." *GECCMC 2005–C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027, 1033 (9th Cir. 2012).

Three categories of parties may sign an MOA. 36 C.F.R. § 800.6(c). The "signatories"—BLM and the SHPO, in this case—are the parties with "authority to execute, amend or terminate the agreement in accordance with this subpart." *Id.* § 800.6(c)(1). "Invited signatories"—here, Lithium Nevada—have the power to amend or terminate an MOA, but not to bring it into existence. *Id.* § 800.6(c)(2). Finally, the agency official may also invite "concurring parties" to concur in the MOA, but those parties lack the power to

---

[32] Any argument that BLM breached the MOA by not acknowledging a letter from the Winnemucca Indian Colony, s*ee* Mot. at 7–8, is foreclosed. One tribe may not assert the rights of another, non-party tribe. *Bartell Ranch*, 2023 WL 1782343 at *19.

[33] Compl. ¶ 163 (seeking an "order ordering BLM to specifically perform the terms and conditions of the MOA.").

amend or terminate an MOA. *Id.* § 800.6(c)(3). SLPT invokes its status as a "concurring party" to the MOA based solely on the signature page listing it under "concurring parties."[34] Notably, however, the space above SLPT's name is empty. Though SLPT was invited to be a concurring party, SLPT never signed the MOA to accept that invitation. And SLPT tacitly concedes this, as it neither alleges nor argues that it ever signed the agreement.

### 3.     BLM has complied with the MOA

Even if it were not otherwise barred, SLPT cannot succeed on its claim for breach because there has been none. Both of the provisions asserted by SLPT contain conditions precedent to action that SLPT contends is required of BLM, and SLPT has not pleaded or argued that those conditions are met—because they are not.

SLPT first contends that BLM violated Stipulation V—which outlines the steps BLM must take if "any signatory or concurring party object[s] to any proposed action to the way the terms of this MOA are implemented"—by not "consult[ing] with the objecting party to resolve the objection."[35] Specifically, SLPT claims that it objected to the way the terms of the MOA were implemented via letter dated October 31, 2022, but BLM failed to initiate consultation to resolve the objection. SLPT cannot succeed on this argument because BLM has no legal obligation under Stipulation V to initiate this consultation because SLPT is not a "signatory or concurring party." Furthermore, even were SLPT such a party, BLM is acting in accordance with its terms. Consistent with advice from the ACHP to treat Tribes as concurring parties despite a lack of any overt concurrence, BLM sent a letter to SLPT on March 14, 2023, seeking consultation with SLPT to resolve its objection.[36]

---

[34] Mot. at 6 (citing ECF No. 3 at 148). SLPT neither pleads nor argues that it is a third-party beneficiary.

[35] Compl. Ex. 35 at 5 (Stipulation V).

[36] *See* Compl. Ex. 22 at 10–11, ECF No. 3 at 90–91; Ex. 19, Mar. 13, 2023 letter from BLM to SLPT. Stipulation V provides no timeframe for compliance, so even were SLPT a concurring party, it cannot succeed on a claim for breach when BLM is taking the action SLPT sought—albeit a little later than SLPT requested. And because this process is ongoing, there is no *final* agency action that could be subject to review under § 706(2) of the APA, even if the Court deemed that an appropriate vehicle for this claim.

SLPT then contends that BLM violated Stipulation II.A.2, which provides that, if the Project is modified in certain ways, no "ground disturbing activity associated with the Project *modifications*" may "be implemented until BLM has reviewed the modifications, confirmed that historic properties would not be adversely affected, and issued a Notice to Proceed."[37] If "*BLM determines* that either additional historic properties would be adversely affected by the Project modification or additional previously unmitigated adverse effects to known historic properties will occur," BLM is required to "notify the SHPO and the Tribes, as appropriate, and initiate the development of an amendment to the MOA and the HPTP per Stipulation VI."[38] SLPT has not pointed to any modification to the "Project design or layout" that would trigger this stipulation, or any BLM determination of adverse effects caused by such a modification. SLPT simply argues that general information about allegedly "unmitigated adverse effects" that "would occur under the MOA and HPTP" requires such amendment.[39] But that is not what the terms of the agreement state. In short, Plaintiffs simply have not demonstrated any breach of contract here.[40]

**B.    Plaintiffs are not likely to succeed on their claim under FLPMA**

Invoking FLPMA, Plaintiffs contend that the Thacker Pass Project's approval "terminated" two existing approved plans of operations and two existing authorized exploration notices filed by Lithium Nevada under 43 C.F.R. subpart 3809, and that any work conducted under these authorizations and notices after the ROD issued violated FLPMA's requirement that BLM act "to prevent unnecessary or undue degradation of the

---

[37] Compl. Ex. 35 at 3 (Stipulation II.A.1 (emphasis added)).

[38] *Id.* (Stipulation II.A.2 (emphasis added)).

[39] Mot. at 8.

[40] SLPT also invokes Stipulation VII of the MOA, which provides that "[i]f any signatory to this MOA determines that its terms will not or cannot be carried out, that signatory shall immediately consult with the other signatories to attempt to develop an amendment," Compl. Ex. 35 at 6, and 36 C.F.R. § 800.6(c)(8), which requires the same. SLPT has not pointed to any determination by any of the *signatories* that the MOA's terms "will not or cannot be carried out," so it cannot prevail on that theory of breach, either.

lands," 43 U.S.C. § 1732(b).[41] Plaintiffs cannot succeed on this claim for three reasons.

First, BLM complied with the law. Plaintiffs' FLPMA claim relies on § 2.2.6 of the Mining Plan of Operations, which describes prior disturbances in the Project Area under the Prior Authorizations, and then provides:

> LNC intends to incorporate all existing disturbance into this Project. Authorization of this [Plan of Operations] and Plan will terminate the [Kings Valley Clay Mine Plan of Operations] (N91547), Kings Valley Lithium Exploration Project (N85255), the Quinn River Valley Test Wells [exploration notice] (N94510), the Far East [exploration notice] (N95396) *and all reclamation requirements.*[42]

Plaintiffs contend that this provision terminated the Prior Authorizations entirely, such that any subsequent work under them was unauthorized. But as BLM explained to Plaintiffs' counsel on September 15, 2022:

> Before the previous Plans of Operations (Plan) can be closed, the new Plan of Operations must be fully bonded to include the disturbance created and/or proposed under these old Plans. BLM does not close any authorized Plans unless the NDEP and the BLM agrees that they are fully reclaimed or the reclamation liability and financial guarantee is assumed by another entity or Plan.[43]

In other words, the Prior Authorizations and "all reclamation requirements" under them would be terminated only after those reclamation requirements were folded into the Thacker Pass Project reclamation financial guarantee. No financial guarantee had been received and accepted when the Thacker Pass ROD was signed in January 2021; the project was not bonded until February 23, 2023. If the authorizations terminated immediately when the Thacker Pass ROD was signed, as Plaintiffs propose, there would have been no reclamation

---

[41] Mot. at 14–16. Plaintiffs raise the Kings Valley Clay Mine Plan of Operations (approved 2014), the Kings Valley Lithium Exploration Project Plan of Operations (approved 2010) (together, the "Kings Valley Approvals"), the Quinn River Valley Test Wells Notice of Intent (filed 2017), and the Far East Notice of Intent (filed 2017) (all four collectively, and without conceding that the notices are "authorizations," the "Prior Authorizations").

[42] Ex. 8, FEIS Excerpt at App'x B 4 (emphasis added). Section 2.4 of the same document likewise acknowledges that Lithium Nevada conducted exploration activities under the Prior Authorizations and includes the same incorporation and termination language. *Id.* at 21.

[43] Compl. Ex. 28, Sept. 2022 email exchange between BLM and Falk at 4, ECF No. 3.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

financial guarantee in place for the unreclaimed Prior Authorizations for a period of over two years. And that would be strictly contrary to the law and BLM's surface-management regulations, which require reclamation guarantees in place to *prevent* unnecessary or undue degradation. 43 C.F.R. §§ 3809.312(c), 3809.412, 3809.615(d) . Plaintiffs thus have not demonstrated that BLM failed to comply with the terms of the Thacker Pass Project or allowed unnecessary or undue degradation.

Second, Plaintiffs contend that "authorization of new work under" the Prior Authorizations violated the NHPA because "BLM never initiated post-review discovery processes for the older projects."[44] But as explained *infra* Argument Part II.D, BLM's ongoing post-review discovery process addresses both the Thacker Pass Project and the Prior Authorizations, so the NHPA was not violated. And 36 C.F.R. § 800.13 does not authorize BLM to rescind approvals or require cessation of work under prior authorizations as that process plays out, so it has not been violated.

Finally, to the extent Plaintiffs purport to challenge the Prior Authorizations, or the sufficiency of consultation efforts preceding them, such a challenge is barred. Any challenge to the Kings Valley Approvals is time-barred because those projects were approved between 2010 and 2014—more than six years before Plaintiffs filed their complaint. *See* 28 U.S.C. § 2501 (6-year statute of limitations). The Court lacks subject-matter jurisdiction over any challenge to the exploration notices because they are not *agency* actions at all. *See* 43 C.F.R. §§ 3809.21, 3809.11(a), 3809.312 (allowing "exploration causing surface disturbance of 5 acres or less of public lands" to commence upon notice and submission of a satisfactory financial guarantee, and without approval of a plan of operations or BLM approval).

Ultimately, Plaintiffs' generalized statements that work under those authorizations "caused adverse effects" and thus *necessarily* caused "unnecessary and undue degradation"[45] ignores the statutory and regulatory requirements and jurisdictional bars in favor of an *ipse*

---

[44] Mot. at 15–16.

[45] Mot. at 15–16.

*dixit* conclusion not supported by statute or regulation. Plaintiffs cannot succeed on their claim under FLPMA.

### C. SLPT is not likely to succeed on its claims challenging the pre-approval NHPA process

Under its individual NHPA claim, SLPT challenges BLM's: (1) consultation with the Tribe before the ROD issued, generally; (2) consultation efforts under 36 C.F.R. § 800.2(c)(2)(ii) in light of the COVID pandemic; and (3) consultation with the Nevada SHPO before issuing the ROD.[46] SLPT is not likely to succeed under any of these arguments.

#### 1. BLM made reasonable efforts to consult with SLPT before approving the Project

SLPT is unlikely to succeed on the merits of its NHPA consultation claim because BLM afforded SLPT a reasonable opportunity to consult before the ROD issued.[47] As described *supra* Background Part II, BLM contacted SLPT about the Project no fewer than four times—during scoping, when sharing the DEIS and FEIS, and when inviting SLPT to join the MOA as a consulting party. SLPT never responded to any of BLM's several efforts to reach out before BLM approved the Project in January 2021.

It was reasonable for BLM to assume that SLPT would not have responded to any additional contacts. Despite BLM's preparation of an ethnography and multiple prior project approvals in the Thacker Pass area, SLPT had never previously identified Thacker Pass as an area of historical or cultural concern. Before the Project was approved, no Tribe ever informed BLM of any sites of cultural or religious significance—such as a massacre site—in the general vicinity. And when BLM initiated consultation with SLPT about the 2014 Kings Valley Clay Project in the same area, the Tribe indicated that it "felt the project was outside

---

[46] Mot. at 8–14.

[47] To the extent that SLPT argues that BLM "fail[ed] to make a reasonable and good faith effort to identify Indian tribes to consult with," Compl. ¶ 151, that claim is barred. As explained above, BLM identified SLPT as a tribe for consultation, so any argument that BLM failed to identify *SLPT* lacks a factual basis. And as this Court has repeatedly informed the other Plaintiffs, one tribe cannot bring such a claim on behalf of *other* tribes. *Bartell Ranch*, 2023 WL 1782343 at *19.

their immediate area of interest and wanted to use their time and resources to comment on projects closer to their reservation."[48]

Courts have routinely found this level of engagement with consulting tribes adequate. *See Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010). Plaintiffs rely heavily on *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of the Interior*, 755 F. Supp. 2d 1104, 1112 (S.D. Cal. 2010), for the proposition that contact does not equate to consultation.[49] But in that case, "BLM's invitation to 'consult' . . . amounted to little more than a general request for the Tribe to gather its own information about all sites within the area and disclose it at public meetings." *Id.* at 1118–19. In any event, the same court rejected the reasoning of that case in a second case styled *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of the Interior*, finding instead that where BLM made numerous attempts to engage in government-to-government consultation and those requests were ignored or rebuffed, BLM had satisfied the NHPA requirements for consultation. 927 F. Supp. 2d 921, 933 (S.D. Cal. 2013), *aff'd.*, *Quechan Tribe of the Fort Yuma Indian Rsrv. v. U.S. Dep't of the Interio*r, 673 F. App'x 709 (9th Cir. 2016). The same is true here, where—despite SLPT's previous disclaimer of interest in the area—BLM made repeated overtures to SLPT and received no response.

## 2. BLM afforded SLPT a "reasonable opportunity" to consult

Second, SLPT argues that it was deprived of a "reasonable opportunity" to consult under 36 C.F.R. § 800.2(c)(2)(ii)(A) or (D) in light of the COVID-19 pandemic.[50] Plaintiffs' argument relies on a single internal BLM email citing recommendations from the ACHP about NHPA consultation during the COVID-19 pandemic.[51] But the same emails make clear that the ACHP's statements were simply that—recommendations—and that BLM

---

[48] Ex. 2 at 84.

[49] Mot. at 9–10.

[50] Mot. at 10–11.

[51] *See id.* at 11.

1  would have to make its own decision whether to proceed.[52] And BLM acted consistent with

2  direction from the Department of the Interior by continuing the approvals process while

3  holding any public meetings virtually.[53]

4         Furthermore, given SLPT's lack of response to BLM's outreach in December 2019—

5  months before the declaration of a national emergency in March 2020—and its lack of

6  engagement in connection with the ethnography or Kings Valley Clay Project, BLM had

7  little reason to expect that SLPT would respond substantively, regardless of COVID-19.

8  Even SLPT's own declarant never states that the pandemic prevented SLPT from engaging

9  in the consultation process, that SLPT ever informed BLM that it required additional time

10  to complete its side of the consultation process in light of the pandemic, or that SLPT would

11  have responded to BLM's letters but for the pandemic. That declaration contains no factual

12  allegations at all about the NHPA consultation process—only summary legal conclusions.[54]

13  SLPT is therefore unlikely to succeed on its claim that BLM generally "should have done

14  more" under the circumstances.

15           **3.       BLM consulted with the Nevada SHPO**

16         Finally, SLPT cannot succeed on its challenges to BLM's consultation with the

17  SHPO.[55] ACHP regulations require BLM, "in consultation with the SHPO . . . to identify

18  historic properties within the area of potential effects." 36 C.F.R. § 800.4(b). The SHPO

19  signed the MOA, which expressly provides that its execution "and implementation of its

20  terms [are] evidence that BLM has taken into account the effects of the Project on historic

21  properties."[56] The SHPO's signature on the MOA thus memorializes the completion of the

---

23  [52] Mot. Ex. 4, April 2020 emails re: COVID guidance, ECF No. 19-4.

24  [53] *See* Ex. 5 at AR-388.

25  [54] *See* Compl. Ex. 2, Lone Eagle Decl. ¶ 14–16, ECF No. 2.

26  [55] Mot. at 11–14. For the same reason that one Tribe cannot bring a claim asserting the
27  consultation rights of another, SLPT cannot assert claims on behalf of a separate sovereign—
    the State of Nevada. *See Bartell Ranch*, 558 F. Supp. at 981.

28  [56] Compl. Ex. 35 at 7.

**Fed. Defs' Opp'n to Mot. for Prelim. Inj.**                                    18

NHPA consultation process.

SLPT cites internal SHPO emails post-dating the ROD's issuance and raising systemic concerns addressing information that BLM also received after the ROD issued or otherwise discussing systemic concerns. But those emails only tell half the story. After these internal emails, RSIC sent a letter to the SHPO in November 2021, asking the SHPO to withdraw its concurrence about effects on historic properties based largely on the same allegations that SLPT raises here. Such a withdrawal would have been the appropriate method for the SHPO to express its disagreement with the NHPA consultation process. But the SHPO declined to do so.[57]

The solitary case SLPT cites in support of this argument—*Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995)—is thus inapposite here. There, the Forest Service concluded that there were *no* traditional cultural properties in the relevant area, despite having information to the contrary. *Id.* at 861–62. Based on the information presented by the agency, that SHPO concurred—but ultimately withdrew its concurrence after learning that the agency had withheld two material affidavits. *Id.* at 862. Plaintiffs have not alleged any such withholding here, where the MOA acknowledges that the Project would adversely affect 57 historic properties, the SHPO concurred and has not withdrawn that concurrence, and no Tribe asserted the massacre site or proposed TCD until after the MOA and ROD were both signed.[58]

---

[57] Ex. 20, Nov. 12, 2021 letter from RSIC to SHPO; Ex. 21, Dec. 7, 2021 letter from SHPO to RSIC. SHPO's December 2021 letter post-dates the communications underlying Plaintiffs' motion. *See* Mot. at 12 (citing September 29, 2021 email and October 12, 2021 ACHP letter). These communications also do not indicate, as SLPT argues, that BLM withheld information about historic properties in the area from the SHPO—rather, they discuss information related to the massacre site that was also brought to BLM's own attention after the ROD issued.

[58] Plaintiffs' contention that BLM misrepresented the SHPO's concurrence in the *Bartell Ranch* litigation, Mot. at 12–13, is mere semantics. As BLM there argued, the SHPO did not suggest any *other* tribes beyond those identified by BLM should be consulted. That fact remains true, and the argument accurate, regardless of whether or not the SHPO itself would itself internally characterize that a "sign off."

Fed. Defs' Opp'n to Mot. for Prelim. Inj.                                          19

**D.      Plaintiffs' claims challenging the post-review discovery process are not ripe**

Plaintiffs cannot demonstrate a likelihood of success on the merits of their claim challenging BLM's compliance with the post-review discovery process, 36 C.F.R. § 800.13(b)(1),[59] because BLM is complying with the applicable regulations.

First and foremost, Plaintiffs' claim is not ripe. A challenge to agency action is not ripe for judicial review until it is final. *See Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1104 (9th Cir. 2007) ("absent *final* agency action, there [is] no jurisdiction in the district court to review" a claim. (emphasis added)); *Nevada v. Dep't of Energy*, 457 F.3d 78, 85 (D.C. Cir. 2006) (agency action that is not final is not ripe for review). BLM is still engaged in the post-review discovery consultation process. BLM's February 23, 2023 letter to the ACHP outlines the steps remaining in that process.[60]

Even if the Court found this claim ripe, BLM is complying with its regulations. In November 2021, BLM notified the SHPO and the ACHP that it was initiating the post-review discovery process after learning that the Thacker Pass area had cultural and historical significance to several Tribes.[61] BLM also committed to collecting oral histories and traditions concerning the 1865 massacre and to conduct an additional Class III inventory on BLM lands nearest the Indian Village marked on the 1869 map.[62] Before these efforts were complete, RSIC and SLPT submitted a statement proposing a TCD that encompassed more than the massacre site raised in the prior litigation.[63] BLM has preliminarily agreed that this proposed TCD is eligible for the National Register of Historic Places due to its association with the *Peehee mu'huh* Massacre and the 1865 Quinn River Massacre (Criterion A), and has requested additional consultation to define its borders and evaluate its eligibility under other

---

[59] Compl. ¶ 153; Mot. at 16–22.

[60] Mot. Ex. 2 at 2.

[61] Compl. Ex. 32 at 1; Ex. 14.

[62] Ex. 14.

[63] *See* Compl. Ex. 3; *see also* Compl. Ex. 6, Aug. 14. 2022 letter from RSIC to BLM.

criteria.[64] The ACHP has acknowledged this ongoing process.[65]

Plaintiffs have not demonstrated any lack of BLM's compliance with the post-review discovery process. They cite the ACHP's April 28, 2022 letter, but cite the portion addressing BLM's pre-approval responses to the SHPO—not the post-review discovery process consultation with the Tribes.[66] They rely on the ACHP's October 12, 2021 letter encouraging BLM to engage in post-review discovery consultation[67]—which BLM is doing. They invoke emails discussing confusion over the regulatory process applicable to Plaintiffs' evolving claims, but do not acknowledge that BLM is proceeding under the § 800.13(b)(1) process or allege any current lack of compliance with that process.[68] Finally, Plaintiffs complain that BLM "approve[d] construction work" under the HPTP and the Prior Authorizations,[69] ignoring the fact that BLM had already issued the relevant authorizations—the Kings Valley Authorizations and the Thacker Pass Project ROD. Plaintiffs have cited no statute or regulation authorizing, let alone requiring, BLM to rescind or disapprove such an approval or prohibit ground-disturbing activities under an approved project during the post-review

---

[64] Mot. Ex. 2 at 1–2.

[65] Ex. 17 at 1–2.

[66] Mot. at 16–17. The ACHP provides "advisory opinion[s]" pursuant to 36 CFR § 800.9(a), which requires the agency receiving them to "consider the views of the council in reaching a decision on the matter in question." *Id.* Plaintiffs have not alleged, let alone established, that BLM has failed to consider the ACHP's opinions—to the contrary, the record before the Court shows that BLM has consistently taken ACHP's opinions into account. While BLM may not have done so at the speed that the ACHP or Plaintiffs would prefer, the BLM's Winnemucca Field Office has been appropriately balancing the many obligations on its time while also engaged in time-consuming litigation over the Thacker Pass Project for over two years now, and Plaintiffs point to no statutory or regulatory deadline that BLM has not met.

[67] Mot. at 17–18.

[68] Mot. at 19–22. Plaintiffs rely on a November 18, 2022 email in which BLM contemplated "going forward with the regulations under 36 C.F.R. § 800.13(b)(3)" after RSIC asked BLM to also conduct post-review discovery under the Kings Valley approvals under which construction had begun. Mot. at 22. But Plaintiffs inexplicably did not include BLM's January 3, 2023 email to Mr. Falk confirming that BLM would "be proceeding under 36 CFR 800.13(b)(1) for the Thacker Pass Project." Ex. 16.

[69] Mot. at 18–19.

---

discovery consultation process.[70]

Ultimately, as described in its February 23 letter, BLM is now considering the whole proposed TCD under § 800.13(b)(1) and has clearly explained how it plans to move forward. The Court should reject Plaintiffs' invitation to "interfere[ ] [before] an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," which is precisely the error the ripeness doctrine is designed to prevent. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003).

### III. Plaintiffs have not demonstrated imminent, irreparable harm

Plaintiffs must show a "likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21. To do so, they must "demonstrate immediate threatened injury," and cannot "merely allege imminent harm . . . ." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Id.* (citation omitted). They have not satisfied this burden.

As an initial matter, there is no presumption of irreparable harm from violation of a procedural statute like the NHPA. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (discussing procedural injury in vacuo). So even if the Court finds Plaintiffs likely to succeed on their NHPA claims, they must still prove irreparable harm.

Second, Plaintiffs' delay in seeking relief cuts against any finding of irreparable harm. *See Lydo Enterprises, Inc. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). SLPT waited over two years after the ROD issued before asserting its NHPA claims. And Plaintiffs have been aware of the factual

---

[70] The only authority they cite is the ACHP's October 12, 2021 letter stating that "[o]nce the BLM has fulfilled these procedural requirements and committed itself to any necessary resolution measures, it could proceed with implementing the undertaking." Mot. at 18. But the ACHP's opinion is advisory in nature and, in any event, ignores the fact that BLM itself would not be "implementing" the undertaking at this stage. The ACHP's more recent February 27, 2023 letter encouraged BLM to expedite the process, acknowledging that construction was soon to begin—but in no way indicating that BLM was authorized to, or should, preclude it. Ex. 17 at 2.

bases underlying their other claims for months now. For example, Plaintiffs' FLPMA claim invokes "work plan approvals" between October and December 2022 and SLPT's breach-of-contract claim relies on an October 31, 2022 invocation of the dispute resolution process.[71] Importantly here, two of the Plaintiffs and all counsel in this case have been active in *Bartell Ranch* for almost two years—since July 2021—and were well aware of the Court's timeframe for issuing a decision in that case. But instead of bringing these claims in a timely manner, they waited until almost three weeks after the Court issued its decision on summary judgment to seek emergency and preliminary injunctive relief.

Finally, Plaintiffs' contend that they will "be irreparably harmed by construction of the Thacker Pass Lithium Mine" absent preliminary injunctive relief because "[a]ll of the Thacker Pass project area is encompassed by" their proposed TCD.[72] But even were Plaintiffs successful on any of their claims, the existence of a TCD would not undo the approval of the Thacker Pass Project or prevent activity approved by the ROD over 18 months before the TCD was even proposed. *Cf. Havasupai Tribe v. Provencio* 906 F.3d 1155, 1165 (9th Cir. 2018) ("eligibility for inclusion on the National Register is not exactly a 'discovery,'" such that "by invoking § 800.13(b), the [agency] may have given the Tribe more than it was entitled to demand."). Ultimately, should the Court find a violation of a procedural statute such as the NHPA, the remedy is *not* a complete cessation of ground-disturbing activity—it is further consultation and development of a plan to avoid, if possible, or otherwise mitigate or minimize the adverse effects of the Project on the traditional cultural resources. *See* 36 C.F.R. § 800.6. And BLM is already engaged in that consultation.

**IV.   The balance of hardships and public interest merge and weigh against an injunction**

Plaintiffs must prove that a preliminary injunction would serve the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the government is a party, the analyses of the public interest and balance of equities merge. *Drakes Bay Oyster Co. v.*

---

[71] Compl. ¶¶ 41–42, 142.

[72] Mot. at 5.

... 

*Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). Absent the necessary showing on the first two elements, the Court "need not dwell on the final two factors" and, "when considered alongside the [movant's] failure to show irreparable harm, the final two factors do not weigh in favor of a stay." *E. Bay Sanctuary Covenant v. Trump,* 932 F.3d 742, 778–79 (9th Cir. 2018).

Here, the orderly administration of government and the protection of reasonable investment-backed expectations are public values that would be disserved by allowing parties to belatedly attack a lengthy, expensive, and complex NEPA/NHPA process after forgoing numerous earlier opportunities to consult on that process—and two years after the ROD issued—with no real justification for the delay. "[E]quity aids the vigilant, not those who sleep on their rights," and a plaintiff who delays so long in seeking equitable relief is not entitled to a preliminary injunction. *Matthews v. San Diego Cnty. Bd. of Supervisors*, No. 3:18-CV-711-GPC-NLS, 2019 WL 1793356, at *10 (S.D. Cal. Apr. 24, 2019) (denying preliminary injunction).

Second, as described above, Plaintiffs have had myriad opportunities to assert their interests in connection with the Thacker Pass Project and previous public processes concerning the Thacker Pass area—some of which they participated in without raising any historical or cultural interest in the area. Were the Court to grant their motion, it would suggest that anyone in a similar position could silently wait out one or more administrative processes while the government expends time and resources reviewing and analyzing plans of operations, as well as extensive and thorough litigation, only to raise a hitherto-undisclosed NHPA claim and other brand-new claims at the eleventh hour.

## CONCLUSION

Plaintiffs provide no basis for the Court enjoin operations under a ROD approved over two years ago, or to issue an order enjoining any ground-disturbing activities under the ROD that the Court has already once expressly declined to vacate. Plaintiffs' motion should be denied.

1

2

3

4          Respectfully submitted this 15th day of March 2023.

5                                          TODD KIM
                                           Assistant Attorney General
6                                          United States Department of Justice
                                           Environment and Natural Resources Div.
7

8           /s/  Arwyn Carroll
                                           ARWYN CARROLL (MA Bar 675926)
9                                          MICHAEL ROBERTSON (DC Bar 1017183)
                                           Trial Attorney
10                                         Natural Resources Section
                                           P.O. Box 7611
11                                         Washington, D.C. 20044-7611
                                           Phone:  202-305-0465
12                                         Fax:  202-305-0275
                                           arwyn.carroll@usdoj.gov
13                                         michael.robertson@usdoj.gov

14                                         Attorneys for Federal Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

28